J-S39030-20

2020 PA Super 224

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
CHESTER M. BRAME :
:
Appellant : No. 599 EDA 2020

Appeal from the Judgment of Sentence Entered January 9, 2020
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000905-2019

BEFORE: LAZARUS, J., OLSON, J., and PELLEGRINI, J.[*]

OPINION BY OLSON, J.: **FILED SEPTEMBER 15, 2020**

Appellant, Chester M. Brame, appeals from the January 9, 2020 judgment of sentence imposing an aggregate sentence of five to ten years' incarceration following Appellant's conviction, in a bench trial, of possession with the intent to deliver a controlled substance (oxycodone), possession of a controlled substance, possession of drug paraphernalia, fleeing or attempting to elude a pursuing police officer, and tampering with physical evidence.[1] We affirm.

The trial court summarized the evidence and testimony adduced at Appellant's suppression hearing as follows:

On October 26, 2018, at approximately 2:50 [p.m.], officers from [the] Cheltenham Township Police Department were conducting surveillance at an apartment complex located at 46 Township Line

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. §§ 780-113(a)(30), 780-113(a)(16), 780-113(a)(32), 75 Pa.C.S.A. § 3733(a), and 18 Pa.C.S.A. § 4910(1), respectively.

Road, Cheltenham, Montgomery County[, Pennsylvania]. Officer Chad Smith was stationed in the parking lot of the apartment complex as part of a team [] conducting surveillance for an arranged undercover drug transaction on a separate and unrelated matter. He was working undercover walking his K9 partner around the parking lot as part of the surveillance team for the planned event.

Officer Smith has specialized training in narcotics trafficking and investigations. During his career, Officer Smith has been a member of the Montgomery County drug task force, [a member of] the Montgomery County East Division SWAT team, and [] a K9 handler for the last five [] years. He testified at the suppression hearing to his extensive experience with illegal drug investigations and arrests, specifically enumerating those involved with illegally diverted prescription pills[,] such as oxycodone. Based on his training in narcotics trafficking and investigations and based on his experience as a Cheltenham [Township] police officer, Officer Smith is familiar with how illegal narcotics, specifically oxycodone, are packaged and sold. Officer Smith [] personally observed hand-to-hand transactions involving pills and other drugs, specifically having observed drug transactions whereby the dealer tosses pills through a car window into the buyer's vehicle pulled alongside.

Sergeant Joseph O'Neill was also working in plain clothes as part of the surveillance for the unrelated matter in the area of 46 Township Line Road on October 26, 2018[,] at approximately 2:50 [p.m.]. He was positioned across the street from the parking lot of the apartment complex in an unmarked police [vehicle] equipped with lights and sirens. Sergeant O'Neill has been a police officer for twenty [] years. He has been a member of the Montgomery County drug task force since 2005. Sergeant O'Neill testified to his extensive experience with illegal drug investigations and arrests, specifically enumerating those involved with illegally diverted prescription pills[,] such as oxycodone or percocet. Based on his training in narcotics trafficking and investigations and his experience as a [twenty]-year police veteran, Sergeant O'Neill is familiar with how illegal narcotics, specifically oxycodone, are packaged and sold. Sergeant O'Neill testified that he [] previously purchased pills in an undercover capacity. Sergeant O'Neill [] personally observed hand-to-hand transactions involving pills and other illegal drugs, specifically having observed drug transactions whereby the dealer tosses pills through a car window into the buyer's vehicle pulled alongside.

Sergeant O'Neill [] personally observed hand-to-hand drug transactions at 46 Township Line Road on prior occasions.

Officer Smith and Sergeant O'Neill were both familiar with the location of 46 Township Line Road due to prior drug investigations and arrests. They knew that location to have a high volume of drug activity. Specifically, Sergeant O'Neill testified that over the course of his fifteen[-]year career[,] he has been personally involved with at least 100 drug investigations or arrests for illegal drug activity at that location. Officer Smith and Sergeant O'Neill knew, based on their training and experience, that drug deals that take place at that location or in the general Cheltenham area often involve dealers from Philadelphia[, Pennsylvania] meeting with buyers from the surrounding counties, specifically Bucks County, [Pennsylvania] because of pricing and convenience of the meeting location.

On October 26, 2018, at approximately 2:50 [p.m.], both Officer Smith and Sergeant O'Neill, separately and independently of one another, observed a silver Dodge minivan drive into the parking lot at 46 Township Line Road and reverse into a parking spot at the rear of the parking lot, far away from the entrance to the apartment building. The man driving the [minivan] was identified as Appellant[.] Appellant was the sole occupant of the [vehicle]. After he parked his vehicle, he remained inside.

Both officers noted that this behavior was of interest to them and something they found unusual based on the fact that there were available parking spaces closer to the entrance of the building. Officer Smith was on foot approximately twenty [] feet from where Appellant parked his vehicle. He could see clearly into Appellant's vehicle through the windshield and front windows. Sergeant O'Neill also had a clear view into the parking lot where Appellant was located, but he noted that his view was occasionally obstructed by passing vehicles.

After several minutes, Appellant pulled out of the parking spot and [moved his vehicle] straight ahead into a different spot, which was no closer to the front entrance. Appellant remained in his vehicle. Both officers testified that this behavior was unusual and suspicious. As such, they each focused their attention on Appellant's vehicle, unsure if it [were] possibly connected to the ongoing drug investigation for which they were [conducting surveillance]. Officer Smith began to walk toward Appellant's vehicle with his [K9 partner].

A few moments later, Officer Smith and Sergeant O'Neill each observed a second vehicle, driven by a female, pull into the parking space directly adjacent to [] Appellant's [vehicle and] on [the vehicle's] passenger side. Officer Smith observed that the passenger side window of [] Appellant's [vehicle] was down, and the driver's side window of the female's [vehicle] was down. Both Officer Smith and Sergeant O'Neill observed Appellant throw a knotted plastic bag out of his passenger side window into the female's vehicle through her driver's side window. Officer Smith then observed the female driver throw loosely balled-up [United States] currency into Appellant's [vehicle]. The female immediately drove out of the parking lot. Officer Smith was approximately ten [] to fifteen [] feet away from the vehicles when he observed this transaction. Sergeant O'Neill was across the street, utilizing binoculars. The officers observed that there was no conversation between Appellant and the female, and neither individual ever exited their vehicle or approached the apartment building. Their entire interaction was very short, lasting approximately twenty [] seconds, which short duration is consistent with typical drug transactions.

Officer Smith and Sergeant O'Neill each ran the registration on both vehicles. Appellant's vehicle was registered to a North Philadelphia address, and the female's vehicle was registered to a Bucks County address. This is consistent with the officers' prior knowledge that drug deals that take place at this location or in the general Cheltenham area often involve dealers from Philadelphia meeting with buyers from the surrounding counties, specifically Bucks County, because of pricing and convenience of the meeting location.

Officer Smith approached Appellant's vehicle. He was on foot, in plain clothes, and accompanied by his K9 [partner] on a leash. When he encountered Appellant, who was seated in the driver's seat of his vehicle, Officer Smith announced in a casual, non-confrontational tone that he was a police officer and displayed his badge. Appellant responded, "huh?" Officer Smith again responded in a casual tone that he was a police officer. Appellant then quickly reversed [his vehicle] out of the parking spot and travelled at a high rate of speed away from Officer Smith and toward the exit to the parking lot. Officer Smith never brandished or reached for his firearm[,] which was concealed under his clothing. Officer Smith never instructed Appellant to get out of his vehicle, never told him he could not leave, nor did he block his ability to exit in any way. Officer Smith did not verbally

communicate to Appellant that he was in custody or under arrest. At the moment when Appellant quickly pulled out of the parking spot, police [vehicles] with lights and sirens activated entered the parking lot in response to the other, unrelated drug investigation.

Sergeant O'Neill observed Officer Smith speaking with Appellant at [Appellant's] vehicle. Sergeant O'Neill activated his lights and sirens to pursue Appellant's [vehicle], as he believed that Appellant [] engaged in an illegal drug delivery. As he pulled into the parking lot where Appellant was located, he saw Appellant's [vehicle] backing out of the parking space at a "good speed" and Officer Smith pointing at the [vehicle]. Multiple marked and unmarked police [vehicles], some with lights and sirens activated, pursued Appellant around the [apartment complex's] parking lot[.] Appellant did not immediately stop for the police, and a brief pursuit ensued. During the pursuit, Appellant was finally forced to stop his vehicle after nearly colliding head-on with a police vehicle and was boxed in by police [vehicles].

Sergeant O'Neill approached Appellant's vehicle and observed knotted up plastic bags with pills in them inside his [vehicle]. Appellant was taken into custody and placed under arrest. Police obtained a search warrant for his vehicle, and recovered approximately 235 pills later identified as oxycodone.

Trial Court Opinion, 4/28/20, at 2-9 (record citations and extraneous capitalization omitted).

On October 26, 2018, Appellant was charged with the aforementioned crimes.[2] The Commonwealth filed a motion to consolidate the instant case with the criminal charges filed against Appellant at docket number CP-46-CR-0000904-2019 ("case 904-2019"), which the trial court granted on

---

[2] We note that the affidavit of probable cause attached to the criminal complaint, in one instance, identified the occupant of the silver Dodge minivan as "Christopher Brame." Criminal Complaint, 10/26/18, at 8.

July 22, 2019. Prior to consolidation, on July 10, 2019, Appellant filed an *omnibus* pre-trial motion that included a motion to suppress the physical evidence seized by the police during the October 26, 2018 episode.[3] After a hearing, the suppression court denied Appellant's *omnibus* pre-trial motion on September 27, 2019. Appellant subsequently agreed to a stipulated bench trial, and on October 31, 2019, a bench trial was held. At the conclusion of trial, the trial court found Appellant guilty of the aforementioned criminal charges. On January 9, 2020, Appellant was sentenced to five to ten years' incarceration for possession with the intent to deliver a controlled substance. In addition, Appellant received a concurrent sentence of one to two years' incarceration for fleeing or attempting to elude a pursuing police officer. This appeal followed.[4]

Appellant raises the following issue for our review: "Did the suppression court err by denying Appellant's motion to suppress physical evidence?" Appellant's Brief at 3. Our standard of review and scope of review of a challenge to the suppression court's denial of a motion to suppress physical evidence is well-settled.

---

[3] Our review demonstrates that the *omnibus* pre-trial motion included within the record presented to this Court in the instant case relates to the matter docketed in the trial court at case 904-2019. The suppression court explained that the *omnibus* pre-trial motion relating to the instant case was erroneously filed at the docket for case 904-2019. A copy of the *omnibus* pre-trial motion related to the instant case, therefore, is not included in the certified record.

[4] Appellant and the trial court complied with Pa.R.A.P. 1925.

> When we review the ruling of a suppression court[,] we must determine whether the factual findings are supported by the record. When it is a defendant who [] appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019) (citation omitted), *cert. denied*, 140 S.Ct. 645 (2019). "As an appellate court, we are not bound by the suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary." *Hicks*, 208 A.3d at 925 (original quotation marks and citation omitted).

Here, Appellant challenges the suppression court's characterization of the initial encounter between Appellant and Officer Smith, arguing that this interaction constituted an investigative detention, not a mere encounter, as determined by the suppression court. Appellant's Brief at 15-16. Appellant contends the suppression court erred in determining that this initial encounter was a mere encounter that required no reasonable suspicion on the part of Officer Smith that criminal activity was afoot. *Id.* Rather, Appellant asserts, "[b]y flashing his badge at [A]ppellant, Officer Smith conveyed to [A]ppellant that he was not free to leave especially because simultaneously therewith numerous marked police cars were streaming into the parking lot." *Id.* at 15. Appellant contends that because this initial encounter was an investigative detention, and because Officer Smith lacked the requisite reasonable suspicion

that criminal activity was afoot when the stop occurred, all physical evidence seized by the officers should have been suppressed. *Id.* at 24.

The Commonwealth asserts that the suppression court correctly determined that the initial encounter between Appellant and Officer Smith was a mere encounter. Commonwealth's Brief at 14. The Commonwealth contends that when Officer Smith approached Appellant and displayed his badge, this action by Officer Smith did not "transform the mere encounter into an investigatory detention." *Id.* at 15. The Commonwealth asserts that "at the moment that [Appellant] and Officer Smith interacted, the police vehicles were not present in the parking lot [and] that police vehicles entered the parking lot after [Appellant] ended the encounter [with Officer Smith] by reversing [his vehicle] out of the parking [space]." *Id.* at 18. Alternatively, if the initial encounter [were] an investigative detention, the Commonwealth argues that Officer Smith possessed reasonable suspicion to justify the investigative detention. *Id.* at 20-27.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution protect a person from unlawful searches and seizures.[5] Our Supreme Court has long held that although the

---

[5] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

- 8 -

Pennsylvania Constitution provides broader protection from unreasonable searches and seizures than the United States Constitution, the **Terry** doctrine, announced in the seminal case of **Terry v. Ohio**, 392 U.S. 1 (1968), "sets forth the reasonableness standard for Article I, [Section] 8 of the Pennsylvania Constitution." **Hicks**, 208 A.3d at 925, 940 (stating, "the **Terry** doctrine unequivocally requires something suggestive of criminal activity before an investigative detention may occur" (emphasis omitted)).

The **Hicks** Court explained the distinction between a mere encounter and an investigative detention as follows:

> [W]arrantless interactions between citizens and police officers fall into three categories, distinguished one from another by consideration of whether the citizen has been "seized" within the meaning of the Fourth Amendment, the intrusiveness and extent of the seizure, and the justification therefor. The first type of interaction - a mere encounter - does not constitute a seizure. It generally involves a request for information and requires no particular suspicion of criminality because it carries no official

---

> shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. art. I, § 8.

compulsion to stop or to respond. During a mere encounter, as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

We recognize only two types of lawful, warrantless seizures of the person, both of which require an appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a [investigative detention] based upon reasonable suspicion. Here, we are concerned with this latter type of seizure - interchangeably labeled an "investigative detention," a "Terry stop," or, when coupled with a brief pat-down search for weapons on the suspect's person, a "stop and frisk."

To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

*Hicks*, 208 A.3d at 927-928 (citations, original quotation marks, and original brackets omitted). The reasonable suspicion standard allows "a police officer to stop an individual based upon [`]specific and articulable facts[`] and [`]rational inferences from those facts[`] that warrant a belief that the individual is involved in criminal activity." *Id.* at 932 (citation and original quotation marks omitted).

For purposes of the Fourth Amendment, a person is "seized" when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 []

- 10 -

(1980). When a police officer "accosts an individual and restrains his freedom to walk away, he [] 'seized' that person." **Brown**[ **v. Texas**], 443 U.S. [47,] 50 [(1979),] *quoting* **Terry**, 392 U.S. at 16[.] In assessing the impression that would be given to a reasonable person, a court must determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" **Florida v. Bostick**, 501 U.S. 429, 437 [] (1991)[,] *quoting* **Michigan v. Chesternut**, 486 U.S. 567, 569 [] (1988)[.]

**Hicks**, 208 A.3d at 926-927.

Initially, our review requires us to determine whether the record supports the suppression court's conclusion that the initial encounter between Officer Smith and Appellant amounted to a mere encounter.[6] We find the record does not support the suppression court's conclusion. Rather, we discern that, as a matter of law, the initial encounter between Officer Smith and Appellant amounted to an investigative detention because Appellant was "seized" by Officer Smith at the time of his initial encounter.

The suppression court, in finding that Appellant was not seized by Officer Smith, and that the initial encounter between Appellant and Officer Smith amounted to a mere encounter, stated,

---

[6] The circumstances of the instant case are akin to an essay question from the Pennsylvania bar exam in which one is left wondering if the circumstances of the unrelated undercover drug operation act as a "red herring" or are a critical factor for consideration. We discern the circumstances of the unrelated undercover drug operation to be the latter to the extent that the actions of the operation affected the mindfulness of the hypothetical reasonable person's understanding of his or her freedom to ignore the police and go about his or her business, as discussed *infra*.

- 11 -

> The initial interaction between Officer Smith and Appellant, when Officer Smith approached Appellant's vehicle, was a mere encounter. Officer Smith was in plain clothes and casually approached Appellant's vehicle on foot with his [K9 partner]. Officer Smith approached Appellant due to his reasonable belief that [Appellant] just engaged in an illegal drug transaction with the female driver. In order to identify himself as a police officer, he produced his police badge. He did not use a confrontational or abrupt tone with Appellant. Officer Smith never instructed Appellant to exit his vehicle. [Officer Smith] did nothing to prevent Appellant from leaving, nor did he communicate to [Appellant] in any way that he was not free to leave. They exchanged very few words until Appellant fled.

Trial Court Opinion, 4/28/20, at 11. In reaching its conclusion that the initial encounter was a mere encounter, the suppression court failed to consider the unfolding events of the unrelated undercover drug operation, substantiated by Sergeant O'Neill's testimony, and the effect those events had on Appellant's perception of his ability to end his encounter with Officer Smith, based upon a reasonable person standard. *See Commonwealth v. Lyles*, 97 A.3d 298, 303 (Pa. 2014) (stating, "[w]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs" (original brackets omitted)), *citing **Chesternut***, 486 U.S. at 573-574; *see also **Commonwealth v. Adams***, 205 A.3d 1195, 1200 (Pa. 2019) (stating, "[t]he test, often referred to as the [`]free to leave test,['] requires the court to determine whether, taking into account **all** of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" (emphasis added, citations and

- 12 -

original quotation marks omitted)); ***Commonwealth v. Shabezz***, 166 A.3d 278, 287-288 (Pa. 2017) (holding that a passenger in a vehicle is seized for constitutional purposes when, in consideration of all of the circumstances surrounding the encounter, the vehicle in which he or she is riding is stopped by police), *citing **Brendlin v. California***, 551 U.S. 249, 263 (2007).

Officer Smith was in plain clothes and located in the parking lot of the apartment complex with his K9 partner as part of an undercover drug operation that was unrelated to the incident involving Appellant. N.T., 9/12/19, at 22-23. This undercover drug operation involved multiple police officers and several marked and unmarked police vehicles that were positioned in the surrounding area. Officer Smith initially testified that after observing the alleged drug transaction between Appellant and the female driver of a second vehicle, the female driver pulled out of her parking spot **at the same time** the police responded in the unrelated undercover drug operation. ***Id.*** at 26 (emphasis added) (stating, "as she was pulling out, that's when the takedown happened for the original job we were there, the buy-bust. So police cars started to move in"). It was at this moment that Officer Smith approached Appellant's vehicle, displayed his police badge, and informed Appellant that he was a police officer. ***Id.*** at 27, 33. After Officer Smith informed Appellant a second time that he was a police officer, Appellant reversed his vehicle out of his parking space at a high rate of speed and attempted to exit the parking lot of the apartment complex. ***Id.*** at 33-34.

Officer Smith subsequently testified that before he approached Appellant, he first walked to Sergeant O'Neill's vehicle and, upon speaking to Sergeant O'Neill, learned that the suspect in the unrelated undercover drug operation was in custody. *Id.* at 38, 57-58. Officer Smith then approached Appellant's vehicle, at which time there were no police vehicles in the immediate vicinity of Appellant's vehicle. *Id.* at 36. Although the suspect in the unrelated undercover drug operation was already in custody, Officer Smith stated the police vehicles did not enter the parking lot of the apartment complex until Appellant reversed his vehicle out of his parking space at a high rate of speed. *Id.* at 37, 57, 59.

Finally, Officer Smith testified that after the police vehicles entered the parking lot as part of the unrelated undercover drug operation, he talked with Sergeant O'Neill, and then approached Appellant. *Id.* at 59. Officer Smith stated Appellant remained in his vehicle and the vehicle remained in its parking space while the unrelated undercover drug operation unfolded. *Id.*

Sergeant O'Neill testified that he observed Appellant's interaction with the female driver from a parking lot located across the street from the apartment complex, where he was stationed as part of the unrelated undercover drug operation. *Id.* at 73, 79. At the time the female driver left her parking space, Sergeant O'Neill said the officers got the go-signal that the unrelated undercover drug operation was unfolding and the officers were to move into position. *Id.* at 79. It was at this moment that the marked and unmarked police vehicles began to enter the apartment complex parking lot.

- 14 -

*Id.* The officers operating the police vehicles activated the vehicles' lights and sirens upon entering the parking lot. *Id.* at 39. Sergeant O'Neill, believing Appellant just committed a felony, entered the parking lot with his police vehicle lights activated with the intention of stopping Appellant's movement. Before Sergeant O'Neill was able to reach Appellant, however, he observed Officer Smith approach Appellant. *Id.* at 80. At no point did Sergeant O'Neill state that he spoke with Officer Smith in the apartment complex parking lot prior to Officer Smith's approach toward Appellant. *Id.* at 65-97.

Officer Smith's recollection of the events was not entirely consistent as to precisely when the police vehicles, with their lights and sirens activated, entered the parking lot. *See* N.T., 9/12/19, at 26 (stating the police vehicles responded to the unrelated undercover drug operation **at the same time** the female driver exited her parking space); *see also id.* at 36-38 (stating Officer Smith talked with Sergeant O'Neill **before** approaching Appellant and **before** any police cars were in the vicinity of Appellant's vehicle); *id.* at 59 (stating the police vehicles entered the parking lot and Officer Smith spoke with Sergeant O'Neill **before** approaching Appellant). Sergeant O'Neill, however, testified in support of Officer Smith's recollection that the police officers, in marked and unmarked police vehicles, entered the apartment complex parking lot in response to the go-signal for the unrelated undercover drug operation at the moment when the female driver exited her parking space and **before** Officer Smith approached Appellant's vehicle. *Id.* at 79-80. The lights and sirens of the marked and unmarked police vehicles were activated as the

police vehicles entered the apartment complex parking lot. Specifically, Sergeant O'Neill observed Appellant reverse his vehicle from the parking space as Sergeant O'Neill entered the parking lot with his vehicle lights and siren activated. *Id.*

In viewing the totality of the circumstances surrounding the incident, a reasonable person, innocent of any crime, would not believe that he or she was free to leave. The initial encounter between Officer Smith and Appellant commenced when Officer Smith approached Appellant, displayed his police badge, and twice identified himself as a police officer. Almost simultaneously, police vehicles, with lights and sirens activated, entered the apartment complex parking lot in which Appellant and his vehicle were located. *See Commonwealth v. Baldwin*, 147 A.3d 1200, 1204 (Pa. Super. 2016) (stating that an investigative detention exists when there has been a show of physical force or a show of police authority), *citing Commonwealth v. Lewis*, 636 A.2d 619 (Pa. 1994). The arrival of the police vehicles, albeit connected to an unrelated undercover drug operation unfolding in the same parking lot as Appellant's alleged drug transaction, conveyed to Appellant that he was not at liberty to ignore Officer Smith and go about his business at the time Officer Smith approached Appellant's vehicle, displayed a police badge, and identified himself as a police officer. *See Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2017) (stating, "we simply cannot pretend that a reasonable person, innocent of any crime, would not interpret the activation of emergency lights on a police vehicle as a signal that he or she is not free to leave"). While

we acknowledge (as the suppression court observed) that our prior cases held that the display of a police badge and an announcement by an individual that he is a police officer, standing alone, do not amount to more than a mere encounter, *see Commonwealth v. Beasley*, 761 A.2d 621, 625 (Pa. Super. 2000) (holding that the displaying of a police badge and asking a defendant if he or she would speak to the police officer is a mere encounter), *appeal denied*, 775 A.2d 801 (Pa. 2001), we nevertheless conclude that Officer Smith's initial encounter with Appellant, as viewed by a reasonable person and based upon the totality of the circumstances, including the simultaneous arrival of multiple police vehicles with lights and sirens activated, was transformed from a mere encounter into an investigative detention, for which reasonable suspicion was required. *See Beasley*, 761 A.2d at 625 (stating, the display of a police badge coupled with a command issued under the color of official police authority causes the mere encounter with the police officer to escalate to an investigatory detention). The suppression court erred as a matter of law, therefore, in concluding that the initial encounter was nothing more than a mere encounter.

Having discerned, as a matter of law, that the initial encounter between Officer Smith and Appellant amounted to an investigative detention, we now examine whether the record demonstrates that Officer Smith had reasonable suspicion that Appellant was involved in criminal activity prior to the initial encounter. To reiterate, "[t]o maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that

the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion." *Hicks*, 208 A.3d at 927, *citing*, *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000). Whether reasonable suspicion exists sufficient to support an investigative detention is evaluated under the totality of the circumstances. *Hicks*, 208 A.3d at 927. "When evaluating whether reasonable suspicion existed in a particular case, this Court must 'view the circumstances through the eyes of a trained officer, not an ordinary citizen.'" *Commonwealth v. Milburn*, 191 A.3d 891, 898 (Pa. Super. 2018), *citing* *Commonwealth v. Riley*, 715 A.2d 1131, 1135 (Pa. Super. 1998). "Although the police officer's own observations, knowledge and experience thus weigh heavily in determining whether reasonable suspicion existed, our courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in the often competitive enterprise of ferreting out crime." *Beasley*, 761 A.2d at 626 (citation and original brackets omitted). "[T]he test we apply remains an objective one and will not be satisfied by an officer's hunch or unparticularized suspicion." *Id.* (citation omitted). "Accordingly, an [police] officer's belief that criminal activity is afoot, albeit plausible under the circumstances, must be linked with his [or her] observation of suspicious or irregular behavior of the particular [suspect] before he [or she] may conduct the stop." *Id.* (citation omitted).

Here, Officer Smith observed Appellant enter the apartment complex parking lot and park his vehicle away from the entrance of the building even

though parking spaces closer to the entrance were available. N.T., 9/12/19, at 25, 27-28. A short time later, Appellant moved his vehicle to a parking space located straight ahead of his current packing space. *Id.* at 26, 29. Appellant remained in his vehicle the entire time. *Id.* at 26. A second vehicle, driven by an unidentified female, subsequently parked adjacent to the passenger side of Appellant's vehicle. *Id.* at 26. 29. With Appellant's vehicle's passenger window down, Officer Smith observed Appellant toss a "knotted clear bag out of his passenger car window into this other car that was parked next to him[.]" *Id.* at 26, 30. Immediately thereafter, Officer Smith observed the female driver of the second vehicle throw a "wadded up ball of cash" through the passenger window of Appellant's vehicle. *Id.* at 26, 30. The vehicle driven by the female then exited the parking lot with the entire interaction between the two parties taking between fifteen and twenty seconds. *Id.* at 26.

Officer Smith, based upon his observations, training, knowledge, and experience in relation to drug transactions and investigation, believed he witnessed an illegal drug transaction. *Id.* at 33. Officer Smith thereafter approached Appellant's vehicle, displayed his police badge to Appellant, and identified himself as a police officer at the same time police cars were entering the parking lot with lights and sirens activated. *Id.* at 33. After Officer Smith identified himself as a police officer a second time, Appellant reversed his vehicle out of the parking space at a high rate of speed in an attempt to exit the parking lot. *Id.* at 33-34.

In viewing the totality of the circumstances involving Appellant's interaction with the female driver through the eyes of Officer Smith, we are persuaded that Officer Smith articulated specific observations that showed Appellant's involvement in criminal activity prior to Officer Smith's initial encounter with Appellant. Specifically, Officer Smith observed the exchange of suspected drugs and money in a practice common to other drug transactions he previously observed. The alleged drug transaction occurred in a high drug trafficking area, took only a short amount of time, occurred in a portion of the parking lot away from the building entrance, and involved two individuals who did not communicate to each other. Finally, the transaction involved two individuals whose automobile registration profiles fit parameters of previously known drug dealers and buyers. Therefore, Officer Smith, having reasonable suspicion that criminal activity was afoot prior to the initial encounter, lawfully engaged Appellant in an investigative detention. Consequently, Appellant's issue is without merit.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2020