J-A16031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TONY HELL | : | |
| | : | |
| Appellant | : | No. 1533 EDA 2024 |

Appeal from the Judgment of Sentence Entered May 10, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003155-2023

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                                        **FILED MAY 12, 2026**

Appellant, Tony Hell, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his bench trial convictions for persons not to possess firearms, carrying a firearm without a license, and carrying firearms on public streets in Philadelphia.[1]  Upon remand from our Supreme Court, we now vacate the judgment of sentence and remand for further proceedings.

The relevant facts and procedural history of this appeal are as follows. On April 13, 2023, Philadelphia Police Officer Dante Givens and his partner, Officer Sowell, were on patrol in West Philadelphia.  Around noon, the officers received a call over police radio.  The call indicated that there were "four males

_____

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

at 46th and Market [Streets], wearing all black clothing, two with black face masks on, [one] with a blue face mask, armed with firearms."[2] (N.T. Suppression Hearing, 8/18/23, at 20-21). Regarding the 4600 block of Market Street, Officer Givens explained: "Due to the fact that it's a subway stop for the el, we get a lot of robbery calls; and sometimes a few shooting calls at that location." (*Id.* at 20).

The officers responded to the scene and immediately observed four individuals matching the description of the suspects. One of these individuals was Appellant. Officer Givens, who was driving the patrol car, stopped the car to allow Officer Sowell to exit. Officer Sowell "began walking behind the males." (*Id.* at 22). Officer Givens proceeded to park the patrol car a little further up the block. Officer Givens exited to take up a position in front of the suspects. Officer Givens observed that Appellant kept "his hand in his jacket,

---

[2] The police radio call stemmed from information provided to a 911 dispatcher by an unidentified caller. The caller "just observed … a group of teens … and then another group of teens, mad, they had a stare-off[.]" (Suppression Hearing Exhibit D-1 at 0:22-0:32). The caller observed "it don't look good." (*Id.* at 0:44-0:46). Although Officer Givens testified that the police radio call described the suspects as armed, the caller did not expressly inform the 911 dispatcher about the presence of a firearm. Rather, the following exchange occurred between the caller and the dispatcher:

> [DISPATCHER:] Alright. Did you see any weapons?
>
> [CALLER:] It looked like they had a bulge. They keep huddling up and doing something in their waist. But if you could just check them out.

(*Id.* at 1:10-1:20).

like in a stiff position, covering his front area[.]" (*Id.*) The officer asked Appellant, "Do you have something in your front area?" (*Id.*) At that point, all four suspects fled. Additional officers responded to the scene, and the pursuit lasted "about a minute." (*Id.* at 23). Ultimately, Officer Douglas Miller apprehended Appellant and recovered a loaded firearm from his front waistband. (*See id.* at 82).

On May 12, 2023, the Commonwealth filed a criminal information charging Appellant with multiple violations of the Uniform Firearms Act ("VUFA"). Appellant filed an omnibus pretrial motion on May 25, 2023. Among other things, Appellant requested the suppression of all evidence obtained as a result of his interaction with the police. Specifically, Appellant claimed that the police conducted an illegal arrest without probable cause, and he was subjected to a "stop and frisk" on less than reasonable suspicion. In addition to the omnibus pretrial motion, Appellant filed a motion to bar consideration of "high-crime area" as a factor in deciding the suppression issue. Appellant insisted that "[a] high-crime area designation must be considered legally irrelevant because it only establishes that other people have committed crimes in the past in that area, not that the particular defendant has engaged in illegal activity." (Motion, filed 7/31/23, at 2).

The court conducted Appellant's suppression hearing on August 18, 2023. The hearing commenced with counsel providing argument on the motion to bar consideration of whether the stop occurred in a high-crime area.

After the court denied this motion, it received testimony from Officers Givens and Miller.[3]  The Commonwealth also presented body camera footage from the officers at the scene, and Appellant presented a recording of the 911 call that prompted the incident.  At the conclusion of the hearing, the court provided an on-the-record statement with its findings of fact.  Nevertheless, the court did not immediately issue its conclusions of law.  The court noted: "My hold up is whether unprovoked flight is enough, and if the officers' testimony is enough to show that this is what's called a high-crime area." (N.T. Suppression Hearing at 125).  Thus, the court continued the matter to provide the parties with additional time to present relevant case law on the matter.  By order entered October 2, 2023, the court denied Appellant's suppression motion.

Appellant proceeded to a stipulated bench trial on March 7, 2024.  At the conclusion of the trial, the court found Appellant guilty of all three counts of VUFA.  On May 10, 2024, the court sentenced Appellant to an aggregate term of eleven and one-half (11½) to twenty-three (23) months' imprisonment, followed by three (3) years of probation.  The court also granted immediate parole to house arrest.  Appellant timely filed a notice of appeal on May 30, 2024.

_____

[3] Significantly, Officer Miller echoed the assessment of Officer Givens regarding the 4600 block of Market Street: "It's a SEPTA stop.  There's a lot of foot traffic, and we see a lot of robberies, shooting, thefts, that kind of thing."  (N.T. Suppression Hearing at 78).

On September 10, 2025, this panel analyzed the relevant case law and held that the court did not commit legal error in denying Appellant's suppression motion. Appellant responded by filing a petition for allowance of appeal with our Supreme Court. On March 18, 2026, our Supreme Court granted the petition and vacated this Court's prior decision. Our Supreme Court also remanded the matter for reconsideration in light of its recent opinion in **Commonwealth v. Lewis**, ___ Pa. ___, 343 A.3d 1016.[4]

Appellant raises two issues for this Court's review:

> Did the police lack reasonable suspicion to justify a seizure under Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution, where the anonymous tip did not in fact allege that someone matching [Appellant's] description brandished a firearm, possessed a firearm, or otherwise engaged in criminal activity, and where police did not observe [Appellant] engage in criminal or sufficiently suspicious activity?
>
> Even if [Appellant] was not seized until he ran and police chased him, did the police still lack reasonable suspicion to justify a seizure under Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution, where:
>
>> a. the evidence presented at the suppression hearing failed to establish that the location where police chased [Appellant] was a high crime area, and
>>
>> b. even if the Commonwealth presented sufficient evidence to demonstrate the area was "high crime," using that fact to support reasonable suspicion

---

[4] Our Supreme Court decided **Lewis** on September 25, 2025, almost two weeks after this panel filed its original memorandum decision for Appellant's case.

violated Article 1, Section 8?

(Appellant's Brief at 2-3).

Appellant's issues are related, and we address them together. Initially, Appellant contends that four uniformed police officers in two separate vehicles arrived at the location where Appellant and his confederates were walking. Appellant asserts that the officers followed the suspects, with Officer Givens questioning Appellant about whether he was concealing something on his person. Appellant maintains that he attempted to terminate the encounter by walking away, but one of the officers cut him off. Under these circumstances, Appellant posits that he "was necessarily seized no later than when Officer Givens asked him whether he had 'something in [his] front area.'" (*Id.* at 20) (quoting N.T. Suppression Hearing at 22). Appellant also suggests that the police lacked reasonable suspicion to conduct a seizure at this point, because the information provided by the anonymous 911 caller contained no allegations of criminal behavior.

Appellant acknowledges the suppression court's conclusions that: "1) he was not seized until after he began running; and 2) his flight occurred in a high-crime area." (*Id.* at 27). Appellant insists, however, that "the Commonwealth failed to adequately establish that the location where [Appellant's] flight occurred was [a] high-crime area." (*Id.*) Appellant complains that the testimony from Officers Givens and Miller did not say "enough about crime in the location where they encountered [Appellant] to

permit the trial court to properly conclude … that [the location] was nonetheless deserving of the designation." (*Id.* at 29-30). Moreover, Appellant argues that "[a]n otherwise unlawful stop cannot be constitutionally justified merely because it occurred in a high-crime area." (*Id.* at 32). For these reasons, Appellant concludes that this Court must reverse the order denying his suppression motion. In light of our Supreme Court's recent decision in *Lewis*, we agree that some relief is due.

The following principles inform this Court's review of a suppression ruling:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017), *appeal denied*, 647 Pa. 522, 190 A.3d 580 (2018).

Contacts between the police and citizenry fall within three general

classifications:

> The first level of interaction is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Rice*, 304 A.3d 1255, 1260 (Pa.Super. 2023) (quoting *Commonwealth v. Goldsborough*, 31 A.3d 299, 305 (Pa.Super. 2011)).

"During a mere encounter, as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* (internal citation and quotation marks omitted). An "investigative detention" is interchangeably labeled as a "stop and frisk" or a "*Terry* stop."[5] *Commonwealth v. Brame*, 239 A.3d 1119 (Pa.Super. 2020), *appeal denied*, 666 Pa. 240, 251 A.3d 771 (2021).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

_____

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

* * *

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.

*Rice, supra* at 1261 (quoting **Commonwealth v. Jones**, 874 A.2d 108, 116 (Pa.Super. 2005)).

"The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." **Commonwealth v. Thomas**, 273 A.3d 1190, 1197 (Pa.Super. 2022), *appeal denied*, 674 Pa. 664, 283 A.3d 793 (2022) (quoting **Commonwealth v. Cottman**, 764 A.2d 595, 598-99 (Pa.Super. 2000)).

These circumstances are to be viewed through the eyes of a trained officer.

In making this determination, we must give due weight … to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Id.* (internal citations and quotation marks omitted).

This Court has reiterated that reasonable suspicion exists where a police officer observes a defendant's unprovoked flight in a high-crime area:

> In [*Commonwealth v.*] *Jefferson*[, 853 A.2d 404 (Pa.Super. 2004)], this Court addressed whether the observation of the appellant in a high crime area and his flight from police combine to establish the familiar *Terry* standard of reasonable suspicion. We recognized that [in] *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),
>
>> the United States Supreme Court held that although mere presence in a high crime area is insufficient to support a *Terry* stop, the additional factor of unprovoked flight was indeed relevant. The Court ultimately concluded that the two factors in combination were sufficient to satisfy the *Terry* standard of reasonable suspicion.
>
> We further observed that the Pennsylvania Constitution affords no additional protections:
>
>> Following *Wardlow*, it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment….
>
> While additional facts may negate reasonable suspicion, *Wardlow* requires no additional facts to establish reasonable suspicion.

*Commonwealth v. Barnes*, 296 A.3d 52, 57-58 (Pa.Super. 2023) (internal quotation marks and some citations omitted).

More recently, the *Lewis* Court elaborated on the relevant considerations for a suppression court when determining what constitutes a high-crime area:

[A]lthough we decline to impose a statistics requirement or adopt a strict test that must be satisfied before suppression courts may consider the relevant characteristics of an area when conducting a reasonable suspicion analysis, one point cannot be overstated: merely intoning the words "high-crime area" is never sufficient to prove an area is, in fact, high in crime. ***See generally*** [***Interest of T.W.***, 669 Pa. 155, 203, 261 A.3d 409, 438 (2021)] (Dougherty, J., concurring) (cautioning officers testifying at suppression hearings to "not rely on broad generalities, or assume certain 'magic words' will satisfy the reasonable suspicion standard"). The Commonwealth bears the burden of proving a high-crime area is, in fact, high in crime, ***see*** Pa.R.Crim.P. 581(H) ("The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights"), and the suppression court is free to discredit the Commonwealth's evidence when appropriate, ***see Commonwealth v. Poplawski***, 634 Pa. 517, 130 A.3d 697, 711 (2015) (it is within the "sole province" of the suppression court "to pass on the credibility of witnesses and the weight to be given their testimony").

In that vein, we agree in broad strokes with Lewis that certain evidence may be especially helpful to suppression courts in determining whether an area is high in crime. ***See*** [***United States v. Wright***, 485 F.3d 45, 53-54 (1st Cir. 2007)] (recognizing that, "[i]n most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, … (2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated, … and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop"). **Thus, we hold that when assessing whether an area is high in crime, a suppression court may consider a variety of factors, including, but not limited to: the geographic scope of the high-crime area; the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical data known to the officer; and the assignment of**

- 11 -

> **specialized police units targeting high-crime areas.** ***See*** [***Commonwealth v. Thompson***, 604 Pa. 198, 211 n.10, 985 A.2d 928, 936 n.10 (2009)] (considering the designation of the area as an "Operation Safe Streets neighborhood," which meant "the Philadelphia Police Department had reached the conclusion, independent of any one officer's personal 'opinion' or 'perspective,' that the neighborhood was a dangerous one"); [***Rice, supra***] (considering evidence that the officer was "working overtime [on the day of the stop] because additional police presence was needed in the area"). However, these factors are discretionary, not mandatory, and it is ultimately up to suppression courts to determine if the Commonwealth has met its burden of proof.
>
> Finally, if the suppression court is satisfied the Commonwealth has introduced sufficient credible evidence implicating the area is high in crime, the court must then determine in its sole discretion what weight to assign to this factor. ***See Commonwealth v. Hughes***, 521 Pa. 423, 555 A.2d 1264, 1273 (1989) (suppression courts have "the prerogative to believe none, all, or part of the testimony, and this fact-finding function includes the duty of determining the weight … of such testimony"). By way of example, if an officer limits a high-crime area to a few blocks, then the designation would undoubtedly carry more weight than if his testimony would render all of North Philadelphia a high-crime area. A prudent judge likely would not give such a broad definition much, if any, weight unless other circumstances weigh against the lack of geographic specificity. **In any event, we believe suppression judges are best suited to make such assessments**, and that they are capable of doing so without the constraints of a multi-prong test.

***Lewis, supra*** at ___, 343 A.3d at 1035-36 (emphasis added) (footnotes omitted).

Instantly, the suppression court analyzed several cases before concluding that Appellant's "unprovoked flight in a high-crime area was sufficient to create reasonable suspicion for the officers' pursuit."

- 12 -

(Suppression Court Opinion at 5). Notwithstanding its conclusion, the suppression court urged the appellate courts "to reconsider the current law surrounding the definition and importance of high-crime areas[.]" (*Id.* at 5-6). Seemingly on cue, our Supreme Court decided *Lewis*, which gives suppression court jurists and litigants more guidance about how to establish whether a police/citizen interaction occurs in high-crime area. Considering that the central argument on appeal revolves around the court's determination regarding a high-crime area, we believe the best resolution of this case is to remand the matter for additional fact-finding pursuant to *Lewis*.[6] Although the record already includes some statements about the subway station serving as a catalyst for increased crime on the block, the parties should have an opportunity to develop a more suitable record in light of the specific factors announced in *Lewis*. Further, we are extremely mindful of our Supreme Court's edict that the suppression court is best suited to assess such evidence in the first instance.

Accordingly, we vacate Appellant's judgment of sentence and remand

_____

[6] We emphasize that our Supreme Court has utilized the remedy of remanding matters to suppression courts following pronouncements of new legal standards. *See Commonwealth v. Romero*, 646 Pa. 47, 115, 183 A.3d 364, 406 (2018) (plurality opinion announcing judgment of court) (remanding matter to trial court to provide parties with opportunity to introduce additional evidence; stating: "Because we have rejected the Superior Court's framework and established a new legal standard, and because parties whose cases are pending upon direct appeal ordinarily are entitled to the benefit of changes in the law, … we will not fault the Commonwealth for its failure to introduce [evidence that could meet the new standard] in the first instance").

for a new suppression hearing. At that time, the court will receive evidence, consistent with the factors announced in **Lewis**, to determine whether Appellant's interaction with the officers truly occurred in a high-crime area.[7]

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/12/2026

---

[7] If the court continues to believe that the block near the subway station amounted to a high-crime area, it can deny the suppression motion again. No new trial will be necessary, and the court may reimpose Appellant's judgment of sentence.