J-S16023-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                    : PENNSYLVANIA
                                                    :

            v.                                   :
                                                    :

MICHAEL HERNANDEZ-SANTANA,    :
                                                    :

           Appellant                 :   No. 2327 EDA 2022

Appeal from the Judgment of Sentence Entered July 15, 2022
In the Court of Common Pleas of Lehigh County
Criminal Division at CP-39-CR-0002656-2020

BEFORE: DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.:                   **FILED JUNE 22, 2023**

Michael Hernandez-Santana (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of persons not to possess firearms.[1] We affirm.

The trial court thoroughly recounted the underlying facts:

> On May 22, 2020, at approximately 10:00 P.M., the City of Bethlehem Police Department received a report of shots fired in the 1500 block of Kadel Drive, Bethlehem, Lehigh County, Pennsylvania. Members of the City of Bethlehem Police Department responded to the call. Upon arrival, Bethlehem police officers made contact with the victim, Joel Herrera [(Mr. Herrera)], who reported that [Appellant] … displayed and fired a handgun during a dispute. Mr. Herrera provided the City of Bethlehem police officers with home security [video] footage that depicted a silver, box-like SUV fleeing from the 1500 block of Kadel Drive.

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

A patrol alert regarding the shooting was issued to all members of the City of Bethlehem Police Department[,] which included the suspect's name, "Michael Hernandez," and the description of the vehicle in which the suspect fled the scene. … [T]he vehicle was described as … [being] either a Nissan or a Scion. Officer Michael Koblish [(Officer Koblish)] of the City of Bethlehem Police Department, assigned to the patrol division, recognized the name of the suspect as he was familiar with [Appellant] from prior encounters with him. Consequently, Officer Koblish drove to the area of [Appellant's] residence on Monroe Street in Bethlehem to look for him and/or the vehicle, but to no avail.

The next day, on May 23, 2020, … Officer Koblish again tried to locate [Appellant]. He drove to the area of 4th and Monroe Streets and observed a "boxy" silver Scion that matched the description of the vehicle from the prior day. The vehicle was parked or idling in front of [Appellant's] residence located at 330 Monroe Street, Bethlehem, Lehigh County. Being aware of the "shots fired" call the previous day and being familiar with [Appellant], Officer Koblish followed the subject vehicle when it pulled away from the residence. While following the vehicle, Officer Koblish ran the registration plate and learned that the vehicle was not registered to [Appellant], but rather to Eric Garcia [(Mr. Garcia)]. Officer Koblish observed the driver turn left onto Hill Street and then make a right turn onto Mechanics Street without using a right turn signal. Consequently, Officer Koblish conducted a traffic stop of the [] silver SUV for this observed traffic violation.

The vehicle was stopped in the 1100 block of Mechanics Street, in front of Cholo's Auto Repair and Towing [(Cholo's)]. The driver and the passenger immediately exited the vehicle. Officer Koblish recognized the driver as [Mr.] Garcia from the National Crime Information Center photograph[, after performing a search of] the vehicle's registration [number,] and [recognized] the front seat passenger as [Appellant]…. Officer Koblish ordered the occupants back in the vehicle and called for assistance[,] in light of the circumstances allegedly involving [Appellant] and a firearm from the previous day. Briefly thereafter, Officer Trevor Tomaszewski [(Officer Tomaszewski)] and Officer Joseph Brylewski [(Officer Brylewski)] arrived, as did Officer Joshua Hobson [(Officer Hobson)].

Upon approaching the driver['s] side of the vehicle, Officer Koblish explained why a traffic stop had been effectuated to the driver, Mr. Garcia. He requested that Mr. Garcia provide … his license, registration, and insurance information. …

Initially, while Officer Koblish was speaking with Mr. Garcia, Officer[s] Tomaszewski and [] Brylewski were speaking with [Appellant]. During the traffic stop, **Mr. Garcia indicated that he had driven [Appellant] to the 1500 block of Kadel Drive the previous day.** He related that [Appellant] had exited the vehicle alone, while Mr. Garcia waited for him in the car. Mr. Garcia further explained that he saw a third party holding a baseball bat as [Appellant] entered Mr. Garcia's car. **Mr. Garcia described that [Appellant], with a gun in his pocket, immediately exited the vehicle and shot a round into the ground.**

Although English was not Mr. Garcia's primary language, he was proficient both speaking and understanding English. Officer Koblish asked Mr. Garcia for consent to search the vehicle. Mr. Garcia granted both verbal and written consent.

Both occupants were asked to exit the vehicle. [Appellant] exited the vehicle on his own accord and stood … [near] the … vehicle on the sidewalk. [Appellant] was leaning against the exterior building of Cholo's garage and smoking a cigarette.

Officer Koblish and Officer Tomaszewski searched the subject vehicle but did not locate any contraband or firearms. During the search, Officer Hobson remained with [Appellant] while Officer Brylewski stayed with Mr. Garcia. After the search was concluded, Officer Koblish returned the documents to Mr. Garcia and advised him that he was free to leave. Mr. Garcia then entered the building to Cholo's….

When Officer Koblish finished conversing with Mr. Garcia, he walked over to join Officer Hobson in speaking with [Appellant] about the location of the firearm. During this conversation, both Officer Koblish and Officer Hobson were calm, conversational, and respectful. While all of the officers were dressed in full uniform and carrying their police[-]issued handguns, none of the officers unholstered their firearms. Indeed, none of the officers threatened to or displayed their weapon. [Appellant] was not

restrained in any manner during the traffic stop. He was neither placed in a patrol vehicle nor transported to a different location.

   ***Miranda* rights were not provided to** [**Appellant.** ***See Miranda v. Arizona***, 384 U.S. 436 (1966) (holding that statements obtained from defendants during a custodial interrogation, without full warning of constitutional rights, are inadmissible under the Fifth Amendment)].

   Officer Koblish inquired of [Appellant] about the previous day. In particular, Officer Koblish asked questions regarding the whereabouts of the firearm that was discharged the day before on Kadel Street. Officer Koblish also requested permission to search [Appellant's] residence, which was denied.

   [Appellant's] primary language is Spanish and none of the officers present were fluent in this language. As [Appellant's] use of the English language is limited, the officers did their best to communicate with [Appellant]. In fact, until Officer Hobson was able to secure an interpreter on the telephone, Mr. Garcia himself assisted the officers at times in the interpretation for [Appellant].

   Although [Appellant] did mention the English word "lawyer," he was speaking to Mr. Garcia at the time. This specific conversation was in regard to [Appellant] not consenting to the search of his residence. **At no time did [Appellant] unequivocally request an attorney or refuse to answer the questions being posed to him.**

   Officer Koblish was not present when [Appellant] made statements about the location of the firearm. However, Officer Hobson was present. **When speaking with [Appellant] through the aid of the interpreter on the phone, [Appellant]** *admitted* **that he had a black handgun and that he had disposed of the firearm by throwing it off the Freemansburg Bridge into the river following the shooting.**

   At the conclusion of the questioning, **[Appellant] was told that he was free to leave and that he could go home**. [Appellant] was not placed under arrest and taken into police custody.

Trial Court Opinion, 5/28/21, at 2-7 (emphasis added; citations, footnotes, and numbering omitted; some capitalization modified).

The trial court further explained:

Detective Sergeant Bradford Jones [(Detective Sergeant Jones)] of the City of Bethlehem Police Department was assigned to [investigate the shooting on Kadel Drive and any associated evidence.] … On May 27, 2022, Detective Sergeant Jones returned to Kadel Drive to canvas the neighborhood for witnesses of the events that unfolded on May 22, 2020. He encountered one resident who [recalled that evening hearing] a "firecracker" and then saw a car speeding away from the area. With the assistance of daylight, Detective Sergeant Jones again looked for the spent [bullet shell] casing, but to no avail. After learning [Appellant] stated that he had disposed of the firearm, Detective Sergeant Jones coordinated with the Bethlehem Fire Department Rescue Team and utilized fishing magnets to attempt to recover the firearm from the river. [Police did not recover a firearm.]

Moreover, on May 25, 2020, Detective Sergeant Jones obtained a search warrant for [Appellant's] residence…. From this residence, firearm-related items were recovered. Specifically, in [Appellant's] bedroom, a spent 9 mm Luger shell casing and a live 9 mm Luger round were found, along with two (2) 38 special live rounds. … In addition, a 12[-]gauge live shotgun shell was found in the kitchen cabinet. Detective Sergeant Jones sent the shell casings and live rounds to the Lehigh County Firearms Lab for Detective Mark Garrett [(Detective Garrett)], a firearm and toolmark examiner with the Lehigh County District Attorney's Office and an expert in the field of firearm and toolmark examination, to analyze. Detective Garrett opined that one (1) of the undischarged cartridges found at the scene …, the discharged 9 mm Luger cartridge … found in the master bedroom of [Appellant's] residence, and the undischarged 9 mm Luger cartridge … found in the master bedroom … all cycled through the same firearm. The other undischarged cartridge found at the scene … did not have any fire pin impression/mark, and therefore no conclusion could be reached as to whether or not that cartridge was ever housed in the same firearm as the other cartridges.

Detective Sergeant Jones also applied for and acquired a search warrant for the cellular phone that was seized by the

authorities from [Appellant's] person. The purpose of this search warrant was to be able to extract digital content off of the cell phone. [Appellant's] cell phone was forwarded to the data lab for analysis. Detective Jonathan Glick [(Detective Glick)] of the Bethlehem Police Department, assigned to the Forensic Services/Crime Scene Unit and … deemed an expert in the field of digital forensics, was asked to extract … information from [Appellant's] cell phone and analyze same. Detective Glick successfully extracted photographs off of the device, including a photograph taken on May 2, 2020 at 3:36 A.M. of [Appellant] holding a firearm. …

Trial Court Opinion, 8/8/22, at 8-9 (citations omitted).

Finally, the trial court explained:

A recorded prison [telephone] call between [Appellant] and an unidentified female revealed, in pertinent part, the following exchange:

[Appellant]: That's fucked up, what gets me mad is, the guy's name is not on there, it's the woman's name, ratting me out.

* * [*]

[Appellant]: Everyone is telling me in here that the charges will be dropped because they don't have the gun, if they don't have the gun ...?

Female: Well, so the gun one should get dropped, because they don't have it. If they had it, then you're fucked.

[Appellant]: Yeah, that would be years, thirty.

Female: And I already took care of that.

[Appellant]: What?

Female: That.

[Appellant]: Where is it?

Female: I already took care of it, I'll tell you later, you

know I can't say anything through here.

[Appellant]: I know, but don't give it to anyone.

Female: Calm down, I already know.

[Appellant]: Alright, that's mine, no one comes fucking around with it later.

Finally, it is undisputed that [Appellant] has an April 4, 2017 conviction in Passaic County, New Jersey for N.J.S.A. § 2C:12-1(B)(A), Aggravated Assault on Law Enforcement [(New Jersey conviction)], a felony offense.

*Id.* at 10 (citing Commonwealth Exs. 24-26).

The Commonwealth charged Appellant with persons not to possess firearms, as well as firearms not to be carried without a license, simple assault, and harassment[2] (remaining charges).

On March 17, 2021, Appellant filed an omnibus pre-trial motion (OPTM) to suppress evidence/statements to police. Appellant claimed, "at the time of the police questioning[, Appellant] was subjected to custodial interrogation, or the equivalent thereof," and police did "not provide[] … the requisite *Miranda* warnings" at any time. OPTM, 3/17/21, ¶¶ 9 & 10. The trial court held evidentiary hearings on March 31, 2021, and April 21, 2021. The trial court denied the OPTM in an order and opinion filed May 28, 2021.

On October 29, 2021, the Commonwealth filed a motion *in limine*. The Commonwealth asked the trial court to

_____

[2] 18 Pa.C.S.A. §§ 6106(a)(1), 2701(a)(3), 2709(a)(1).

enter an order finding that New Jersey's N.J.S.A[.] 2C:12-1B(5)(a) aggravated assault on law enforcement[, (New Jersey statute),[3]] is an equivalent crime to the enumerated offense Section 2702 (relating to aggravated assault)[4] in 18 PA.C.S.A.

_____

[3] The New Jersey statute provides, in pertinent part, as follows:

**a.** Simple Assault.  A person is guilty of assault if the person:

(1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another….

\* \* \*

**b.** Aggravated Assault.  A person is guilty of aggravated assault if the person:

\* \* \*

(5) Commits a simple assault as defined in paragraph (1), (2), or (3) of subsection a. of this section upon:

(a) Any law enforcement officer acting in the performance of the officer's duties while in uniform or exhibiting evidence of authority or because of the officer's status as a law enforcement officer….

N.J.S.A. 2C:12-1B(5)(a) & (b).

[4] Section 2702 of our Crimes Code provides in relevant part:

**(a) *Offense defined*.**  A person is guilty of aggravated assault if he:

(3) attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty[.]

\* \* \*

*(Footnote Continued Next Page)*

- 8 -

§ 6105(b) as it pertains to 18 Pa.C.S.A. § 6105(a)(1) persons not to possess firearms.

Motion *in Limine*, 10/29/21, at 2 (unnumbered) (footnotes added; some capitalization modified). The trial court held a hearing on November 2, 2021, and subsequently granted the Commonwealth's motion *in limine*.

Appellant filed a motion for reconsideration. **See** Motion to Reconsider, 11/17/21, n.1 (claiming "the *actus reus* and *mens rea* provided in the New Jersey statute are substantially broader than the allegedly corresponding Pennsylvania statute. **Compare** N.J.S.A. 2C:12-1 **with** 18 Pa.C.S.A. § 2702(a)(3)."). The trial court denied Appellant's motion to reconsider, stating:

> This court recognizes that "[i]n order to convict a defendant for possession of a firearm by a prohibited person, the Commonwealth must prove the defendant was previously convicted of a specific offense enumerated in section 6105." **Commonwealth v. Hewlett**, 189 A.3d 1004, 1009 (Pa. Super. 2018), *citing* **Commonwealth v. Jemison** 98 A.2d 1254, 1261 (Pa. 2014). …
>
> After focusing on and considering the elements of the offenses as set forth in the statutes in both jurisdictions, this court determined that N.J.S.A. 2C:12-1B(5)(a)[,] aggravated assault on law enforcement[,] **is an equivalent crime to aggravated assault as enumerated in 18 Pa.C.S.A. § 6105(b).**

---

**(c) *Officers, employees, etc., enumerated.*** The officers, agents, employees and other persons referred to in subsection (a) shall be as follows:

   (1) Police officer.

18 Pa.C.S.A. § 2702(a)(3) & (c)(1).

Order, 12/20/21, n.1 (emphasis added; some capitalization modified).

The matter proceeded to a jury trial in April 2022.[5] The parties stipulated to Appellant's New Jersey conviction. N.T., 4/27/22, at 79 ("It is hereby stipulated [that Appellant] … has an April 4th, 2017 conviction in … New Jersey[] for … aggravated assault on law enforcement, a felony offense."). The jury found Appellant guilty of persons not to possess firearms. The trial court deferred sentencing for the preparation of a presentence investigation report (PSI).[6] Based on Appellant's New Jersey conviction, the PSI stated that Appellant had a prior record score (PRS) of 2. **See** N.T., 7/15/22, at 11.

Sentencing occurred on July 15, 2022. Prior to the imposition of sentence, Appellant's counsel argued, contrary to the PSI, that Appellant had a PRS of 0, as the New Jersey statute is not equivalent to 18 Pa.C.S.A. § 2702(a)(3). **See id.** at 6-10. The prosecutor disagreed. **See id.** at 11 (arguing Section "2702(a)(3), aggravated assault … on police, would be the appropriate equivalent statute[,] which has a prior record score of 2."). The trial court agreed with the prosecution, **see id.** at 11-12, and sentenced Appellant to 66 months – 12 years of imprisonment (applying a PRS of 2). **Id.**

Appellant timely filed a post-sentence motion on July 25, 2022. Appellant claimed, *inter alia*, that the sentencing court erred in applying an

_____

[5] The trial court granted Appellant's pre-trial motion to sever the remaining charges on November 5, 2021.

[6] The PSI is not contained in the record.

incorrect PRS. Post-sentence Motion, 7/25/22, ¶¶ 12-15. The trial court denied Appellant's post-sentence motion on August 8, 2022. Appellant filed a timely appeal and complied with Pa.R.A.P. 1925(b).

Appellant presents four issues for review:

1. Did the trial court err in denying Appellant's omnibus pre-trial motion to suppress where Appellant was given multiple commands by various officers over a period of more than forty (40) minutes, where he was questioned repeatedly about a firearm, where officers lied to him about having video and scientific evidence of him with a firearm, and where not one of the four officers read him warnings pursuant to **Miranda v. Arizona**, 384 U.S. 436 (1966)[?]

2. Did the trial court err in granting the Commonwealth's "Motion *in Limine* Requesting Pretrial Finding that N.J.S.A. 2C:12-1b(5)(a) Agg Assault on Law Enforcement is an Equivalent Crime to Aggravated Assault as Enumerated in 18 Pa.C.S.A. § 6105(b)," and denying Appellant's subsequent motion to reconsider where the New Jersey statute is broader both in terms of *mens rea* and *actus reus*[?]

3. Did the Commonwealth fail to present sufficient evidence to support a verdict of guilty of persons not to possess … firearms …, 18 Pa.C.S. § 6105, where Appellant does not have a disqualifying conviction, or where the Commonwealth failed to prove beyond a reasonable doubt that Appellant was in possession of a firearm[?]

4. Did the trial court abuse its discretion in sentencing Appellant to sixty-six (66) months to twelve (12) years of incarceration where it held his New Jersey conviction to be equivalent to aggravated assault under 18 Pa.C.S. § 2702(a)(3), thereby miscalculating his prior record score, and where the New Jersey statute is broader both in terms of *mens rea* and *actus reus*[?]

Appellant's Brief at 6-7 (some capitalization modified).

Appellant first claims the trial court erred in denying his OPTM, where police unlawfully subjected him "to a custodial interrogation without the safeguards demanded by *Miranda*…." *Id.* at 19. According to Appellant:

[T]hree police cars responded [on May 22, 2020, and Appellant] was [] confronted by two officers—one of which [*sic*] dwarfed him in height and apparent muscle mass[; Appellant] was not put in restraints, and he was frisked. The officers … grilled Appellant for over forty minutes about the location of the "pistola." The officers [] blatantly lied about being in possession of fingerprint evidence that linked [Appellant] to the crime. And the officers [] blatantly lied about being in possession of video footage that showed [Appellant] with a firearm. Looking at all of these circumstances, it is clear that no reasonable person would have felt free to leave at that point; therefore, Appellant was subject to a custodial interrogation, necessitating the warnings prescribed by *Miranda*, protections that not one of the four officers provided him.

*Id.* at 21.

The Commonwealth counters:

[T]he basis for the traffic stop was for an investigative purpose and not to take the Appellant into custody. This is especially evident since Appellant was not taken into custody at the completion of the stop[,] even after he admitted to possessing and using the firearm. Furthermore, the conditions of the stop were not so coercive that the officers significantly restricted or curtailed Appellant's freedom of movement. … [T]he conversations between Appellant and law enforcement remained calm, conversational, and respectful at all times throughout the stop. Furthermore, the officers did not brandish any weapons[.] … Most notably, Appellant was not restrained in any manner during the traffic stop. … The entirety of the traffic stop was in a public location.

Commonwealth Brief at 15 (break omitted).

We apply the following standard in reviewing the denial of a motion to suppress:

- 12 -

[W]e must determine whether the factual findings are supported by the record. When it is a defendant who appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Brame*, 239 A.3d 1119, 1126 (Pa. Super. 2020) (citation and brackets omitted). Our scope of review is limited to the record developed at the suppression hearing, considering the evidence presented by the Commonwealth as the prevailing party and any uncontradicted evidence presented by Appellant. *Commonwealth v. Fulton*, 179 A.3d 475, 487 (Pa. 2018).

This Court has explained:

Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of *Miranda* rights. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. In evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances.

Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of his freedom of action in any significant way[,] or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being

- 13 -

interrogated reasonably believes his freedom of action is being restricted.

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. Thus, the ultimate inquiry for determining whether an individual is in custody for *Miranda* purposes is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Commonwealth v. Gonzalez*, 979 A.2d 879, 887-88 (Pa. Super. 2009)

(citations, ellipses, brackets, and quotation marks omitted).

We have further stated:

The usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest. Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for *Miranda* purposes.

*Commonwealth v. Mannion*, 725 A.2d 196, 202 (Pa. Super. 1999) (*en banc*) (citations omitted). "An ordinary traffic stop becomes 'custodial' when the stop involves coercive conditions, including, but not limited to, the suspect being forced into a patrol car and transported from the scene or being physically restrained." *Id.* (citation omitted).

Here, the trial court rejected Appellant's claim that police subjected him to a custodial interrogation:

[Appellant] was not deprived of his freedom of movement in any significant way. Therefore, [Appellant] was not in custody at the time of questioning outside of Cholo's…. Indeed, Officer Koblish and Officer Hobson **intermittently** questioned [Appellant] about the location of the firearm that Mr. Herrera had alleged that

- 14 -

[Appellant] discharged the previous day. **There were no restraints utilized and there was no show, threat, or use of force**. [Appellant] was not transported to a different location against his will. While [Appellant] was in investigative detention at the time of the questioning, [he] was not in custody. Consequently, **Miranda** warnings were not required to be provided to [Appellant].

Next, this court must determine whether the confession was voluntary. In determining the voluntariness of a confession, the trial court must consider and evaluate the totality of the circumstances surrounding the confession. This standard has been applied regardless of the custodial nature of the interrogation. **Commonwealth v. Johnson**, 727 A.2d 1089, 1099 (Pa. 1999). When evaluating the totality of the circumstances, the factors to be reviewed include the following:

> The duration, and the methods of interrogation; the conditions of detention, the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's power of resistance to suggestion and undermine his self-determination.

**Commonwealth v. Hunt**, 398 A.2d 690, 692 (Pa. Super. 1979). **See also Commonwealth v. Perez**, 845 A.2d 779, 787 (Pa. 2004). The burden rests with the Commonwealth to show the voluntariness of a confession by a preponderance of the evidence. **Commonwealth v. Moore**, 311 A.2d 620[, 622] (Pa. 1973). The voluntariness of such a confession may be based solely on the credible testimony of the interrogating officer. **Commonwealth v. Cornish**, 370 A.2d 291[, 297-98] (Pa. 1977). Furthermore, it is exclusively within the province of the trial court to determine the credibility of the witnesses and the weight to be accorded to their testimony. **Commonwealth v. Fitzpatrick**, 666 A.2d 323, 325 (Pa. Super. 1995)….

[] Officer Koblish and Officer Hobson spoke with [Appellant] in a calm and conversational tone. The questions posed by the officers were aimed at learning the location of the firearm in order to protect the community. No threats were issued by the officers and none of the officers displayed or brandished their firearm. [Appellant] was not handcuffed, shackled, tethered, or otherwise restrained during this questioning. Instead, [Appellant] was

- 15 -

casually leaning against the exterior wall of Cholo's …, smoking a cigarette. While [Appellant] had difficulty communicating with the officers in English, his own friend, **Mr. Garcia**[,] **aided in interpreting until Officer Hobson obtained an interpreter who was utilized via speaker phone**. The record is void of any coercive tactics employed by the officers to force [Appellant] into a confession or to undermine his self-determination. Based on the foregoing, [Appellant's] statements were voluntarily, knowingly, and intelligently made to Officer Koblish and Officer Hobson.

Trial Court Opinion, 5/28/21, at 9-11 (emphasis added; citations and some capitalization modified). The trial court's reasoning is supported by the record and the law; it did not abuse its discretion in denying Appellant's OPTM. **See id.**; **see also Mannion**, **supra**. Appellant's first issue fails.

Appellant next claims the trial court improperly granted the Commonwealth's October 29, 2021, motion *in limine*, because Appellant's "New Jersey conviction for aggravated assault is equivalent to 18 Pa.C.S.A. § 2701 (simple assault)," rather than 18 Pa.C.S.A. § 2702 (aggravated assault). Appellant's Brief at 23 (some capitalization modified). According to Appellant, "the New Jersey statute is far broader" than Section 2702, "both in terms of *mens rea* and *actus reus*." **Id.** at 24.

When reviewing a trial court's ruling on a motion *in limine*, this Court applies an abuse of discretion standard of review. **Commonwealth v. Harrington**, 262 A.3d 639, 646 (Pa. Super. 2021). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of

partiality, prejudice, bias or ill-will." *Id.* (citation omitted). Moreover, to the extent that Appellant's claim "presents a question of statutory construction, our standard of review is *de novo* and the scope of our review is plenary."

***Commonwealth v. Vandyke***, 157 A.3d 535, 538 (Pa. Super. 2017).

This Court has explained:

[W]hen determining the Pennsylvania equivalent statute for a prior, out-of-state conviction …, courts must identify the elements of the foreign conviction and on that basis alone, identify the Pennsylvania statute that "is substantially identical in nature and definition" to the out-of-state offense. [***Commonwealth v.***] ***Bolden***, 532 A.2d [1172,] 1176 [(Pa. Super. 1987)]. Courts are not tasked with ascertaining the statute under which the defendant would have been convicted if he or she had committed the out-of-state crime in Pennsylvania. Rather, we must compare "the elements of the foreign offense in terms of classification of the conduct proscribed, its definition of the offense, and the requirements for culpability" to determine the Pennsylvania equivalent offense. [***Commonwealth v.***] ***Northrip***, 985 A.2d [734,] 740 [(Pa. 2009) (citation omitted).]

***Commonwealth v. Spenny***, 128 A.3d 234, 250 (Pa. Super. 2015) (footnote omitted); ***see also Commonwealth v. Robertson***, 722 A.2d 1047, 1049 (Pa. 1999) (when evaluating whether offenses are equivalent, courts should compare the requisite elements of the respective crimes, including the *actus reus* and the *mens rea*). "With respect to the underlying policy of the statutes, … analysis of policy considerations is appropriate, though not controlling." ***Northrip***, 985 A.2d at 740.

Instantly, the trial court found:

the elements of … the New Jersey statute and [Section 2702(a)(3)] are substantially identical to each other, as are the *mens rea* and the *actus reus* which form the basis for liability.

- 17 -

Moreover, the public policy behind these two [] statutes are substantially identical, as both of these statutes promote the safety and well-being of police officers. …

Trial Court Order, 11/15/21, n.1.

Moreover, the trial court stated at sentencing:

I have reviewed the elements of [both the New Jersey statute and Section 2702(a)(3), and] the conduct prohibited by these offenses and the overall public policy behind both of these offenses.

They are substantially identical both in *mens rea* and *actus reus*, and the policy behind both of these is to promote the safety and wellbeing of police officers. And, so, I do believe that they are the equivalent offense.

N.T., 7/15/22, at 11.

The trial court's reasoning and ruling is supported by our review of the record, and the law belies Appellant's claim that the trial court erred or abused its discretion.

In his third issue, Appellant argues his conviction of persons not to possess firearms is not supported by sufficient evidence. *See* Appellant's Brief at 24-25. When reviewing a sufficiency challenge,

we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. Additionally, the Commonwealth may sustain its burden solely by means of circumstantial evidence.

- 18 -

*Commonwealth v. Lake*, 281 A.3d 341, 346 (Pa. Super. 2022) (citations and quotations omitted). "Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019) (citation omitted).

The Crimes Code defines persons not to possess firearms, in pertinent part, as follows:

**(a) *Offense defined.***

**(1)** A person who has been **convicted of an offense enumerated in subsection (b), within or without this Commonwealth**, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not **possess**, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

* * *

**(b) *Enumerated offenses.*** The following offenses shall apply to subsection (a):

* * *

Section 2702 (relating to aggravated assault).

18 Pa.C.S.A. § 6105(a)(1) & (b) (emphasis added). Possession can be established "by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa. Super. 2018) (citation omitted).

According to Appellant, "the Commonwealth did not, and cannot, prove that Appellant has been convicted of an enumerated offense" in Section 6105(b). Appellant's Brief at 25. Appellant claims,

> the Commonwealth also failed to prove beyond a reasonable doubt that he ever possessed a firearm. In the light most favorable to the Commonwealth, the evidence merely shows that Appellant at one time possessed a firearm through which one of the live rounds on scene[,] as well as a casing found at [Appellant's] home[,] were cycled. It is mere speculation that he possessed a firearm when not a single person saw him with a gun, nor was one ever located.

*Id.*

Contrary to Appellant, the Commonwealth claims it presented sufficient evidence to sustain Appellant's conviction of persons not to possess firearms:

> Appellant *admitted that he possessed a black handgun* and that he had disposed of the firearm by throwing it off the Freemansburg Bridge into the river following the shooting. However, this was not the only evidence of Appellant's possession that was presented by the Commonwealth.
>
> The Commonwealth also presented a firearm and toolmark expert who indicated one [] of the undischarged cartridges found at the scene, the discharged 9 mm Luger cartridge found in the master bedroom of the Appellant's residence, and the undischarged 9 mm Luger cartridge found in the master bedroom of the Appellant's residence, all cycled through the same firearm.
>
> Furthermore, the Commonwealth also presented evidence of the Appellant discussing his possession of the firearm with a female associate [in a recorded prison call,] and directing her to not give the firearm to anyone else because [it] belong[ed] to him. Appellant's statements in this phone call not only evidenced his prior possession of the firearm but his future intent to possess the firearm.

Commonwealth Brief at 23 (italics in original). We agree.

The trial court thoroughly explained its rejection of Appellant's sufficiency challenge in its August 8th, 2022 opinion. *See* Trial Court Opinion, 8/8/22, at 3-11. In sum, the court recounted the facts set forth above and concluded:

> Viewing all the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth, it is clear that the evidence was sufficient to enable a finder of fact to conclude that the elements of … person not to possess a firearm were established beyond a reasonable doubt. Indeed, at the conclusion of the jury trial, the jury had no doubt that [Appellant] had been convicted of an enumerated offense, *i.e.*, aggravated assault on law enforcement, and he had both the intent and power to control the firearm.

*Id.* at 10-11 (some capitalization modified); *see also id.* at 3-10 (facts).

Our review discloses record and legal support for the trial court's reasoning. Indeed, Appellant **concedes** he "possessed a firearm through which one of the live rounds [found] on scene[,] as well as a casing found at his home[,] were cycled." Appellant's Brief at 25. Appellant was prohibited from possessing a firearm and had a prior conviction for a crime enumerated under Section 6105(b). Accordingly, we affirm based on the trial court's reasoning. *See* Trial Court Opinion, 8/8/22, at 3-11; *see also*, *e.g.*, *Hewlett*, 189 A.3d at 1009 (upholding defendant's conviction for persons not to possess firearms, where defendant fled police on foot following a high-speed vehicle chase; police recovered a firearm on the street in an area where police saw defendant hiding; defendant admitted to possessing a firearm in a

recorded prison phone call; and the parties stipulated at trial that defendant had a prior robbery conviction and was prohibited from possessing firearms).

In Appellant's final issue, he claims the trial court erred in applying an incorrect PRS of 2 at sentencing, when Appellant's PRS should have been 0. Appellant's Brief at 25-28.

A claim that the court applied an incorrect PRS implicates the discretionary aspects of sentencing. *See Spenny*, 128 A.3d at 241. Such challenges "are not subject to our review as a matter of right." *Id.* Rather, where, as here, the appellant preserved his sentencing challenge in a timely post-sentence motion, he must (1) include in the appellate brief a Pa.R.A.P. 2119(f) concise statement of the reasons relied upon for allowance of appeal of; and (2) show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. ***Commonwealth v. Summers***, 245 A.3d 686, 691 (Pa. Super. 2021).

Instantly, Appellant's brief includes a Rule 2119(f) statement, *see* Appellant's Brief at 25-26, and his claims present a substantial question. *See Spenny*, 128 A.3d at 241 (citing ***Commonwealth v. Johnson***, 758 A.2d 1214, 1216 (Pa. Super. 2000)). Thus, we turn to the merits of Appellant's issue, which we "review for an abuse of discretion." *Spenny*, 128 A.3d at 241.

With respect to a defendant's out-of-state convictions and application of a PRS, the sentencing guidelines provide: "An out-of-state … conviction or

adjudication of delinquency is scored as a conviction for the current equivalent Pennsylvania offense." 204 Pa. Code § 303.8(f)(1). Alternatively, "[w]hen there is no current equivalent Pennsylvania offense, determine the current equivalent Pennsylvania grade of the offense based on the maximum sentence permitted, and then apply § 303.8(d)(2)." *Id.*

According to Appellant,

> the elements of the New Jersey statute precisely match up with those of Pennsylvania's simple assault statute, but it should be further noted that the maximum term of imprisonment for the New Jersey statute is 5 years, which under 204 Pa. Code § 303.8(f)(3)[,] would also be equivalent to a misdemeanor for prior record score purposes. *See* N.J.S.A. § 2C:12- 1B, and N.J.S.A. § 2C:43-6A(3). In either of these cases, then, Appellant's prior record score should be a zero.

Appellant's Brief at 27-28 (some capitalization modified).

We have already determined that the trial court properly rejected Appellant's argument that the New Jersey statute is not equivalent to Section 2702(a)(3). Thus, there is no merit to Appellant's instant claim that sentencing court improperly applied the New Jersey conviction and a PRS of 2. *See* Trial Court Opinion, 8/8/22, at 14 ("[Appellant's PRS was] properly calculated to be a 2. As such, the standard range of the sentencing guidelines is forty-eight (48) to sixty-six (66) months. This [c]ourt imposed a minimum sentence within the standard range of the sentencing guidelines and the maximum sentence was set at the statutory maximum."); *Commonwealth v. Snyder*, 289 A.3d 1121, 1127 (Pa. Super. 2023) (stating sentencing guidelines are "purely advisory in nature," and a "sentencing court is

permitted to deviate from the sentencing guidelines" where it places "on the record its reasons for the deviation." (citations omitted)). Accordingly, Appellant's final issue challenging his sentence fails.

Judgment of sentence affirmed.

*Judgment Entered.*

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2023