J-S41022-22

2023 PA Super 4

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY L BATHURST, JR. | : | |
| | : | |
| Appellant | : | No. 821 MDA 2022 |

Appeal from the Judgment of Sentence Entered April 14, 2022
In the Court of Common Pleas of Centre County
Criminal Division at CP-14-CR-0000401-2021

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY MURRAY, J.:                           **FILED JANUARY 06, 2023**

Gary L. Bathurst (Appellant) appeals from the judgment of sentence entered after the trial court convicted him of driving under the influence of alcohol (DUI) (incapable of safe driving – first offense), DUI (blood alcohol concentration (BAC) between 0.08% and 0.10%) and DUI (high rate of alcohol – BAC between 0.10% and 0.16%).[1]  After careful review, we affirm.

At 1:53 a.m. on October 10, 2020, Pennsylvania State Trooper Shane Eichelberger and Pennsylvania State Trooper Nathan Gordon were on routine patrol in a marked police cruiser in Centre County.  While patrolling on North Eagle Valley Road, they observed a truck parked in a vehicle pull-off with its

---

[*] Former Justice specially assigned to the Superior Court.

[1] 75 Pa.C.S.A. § 3802(a)(1)-(2), (b).

rear lights on. The troopers entered the pull-off and parked about 15 yards behind the truck.

Trooper Eichelberger exited the police cruiser and walked to Appellant's truck. As the trooper approached, Appellant rolled down the driver's side window and lowered the volume on the radio. The trooper immediately noticed the odor of alcohol coming from inside the truck. He further observed that keys were in the ignition and the engine was running. Additionally, Trooper Eichelberger saw an open case of beer in the rear of the truck, but no empty containers. When the trooper asked, Appellant at first denied that he had been drinking, but then admitted he had a couple of drinks at a local bar before driving to the pull-off. Because Appellant showed signs of intoxication, Trooper Eichelberger directed him to exit the truck. The troopers then administered field sobriety tests which Appellant failed. The troopers arrested Appellant for DUI and drove him to the hospital for a BAC test. The test revealed Appellant had a BAC of .114%, plus or minus .014%.

Appellant filed a pre-trial suppression motion. Following a hearing on January 3, 2022, the suppression court denied the motion. The case proceeded to trial, and the trial court convicted Appellant of the above charges. On April 14, 2022, the trial court sentenced Appellant to an

aggregate six months of probation.[2] Appellant timely appealed. Appellant

and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents two issues for review:

I. Whether the Suppression Court abused its discretion and erred as a matter of law in denying [Appellant's] motion to suppress all evidence and fruit of the poisonous tree, which was obtained as a result of the search and seizure at issue since the arresting officer's initial encounter with [Appellant] was, from its inception, an investigative detention that was not supported by reasonable suspicion?

II. Whether the evidence presented at [Appellant's] nonjury trial was insufficient to support the guilty verdicts for 75 Pa.C.S.A. § 3802(a)(1), 75 Pa. C.S.A. § 3802(a)(2), and 75 Pa. C.S.A. § 3802(b) since the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] operated, or was in actual physical control of the movement of his motor vehicle after imbibing a sufficient amount of alcohol to render him incapable of safely driving, operating, or being in actual physical control of his motor vehicle?

Appellant's Brief at 7.

Appellant first argues that the trial court improperly denied his

suppression motion. He asserts:

Trooper Eichelberger and Trooper Gordon's interaction with Appellant was, from its inception, an investigative detention unsupported by a reasonable articulable belief that Appellant had violated any provisions of the Motor Vehicle Code or that Appellant was engaged in criminal activity.

_____

[2] Pursuant to this Court's directive, the trial court amended its docket to properly reflect the April 14, 2022, judgment of sentence. **Commonwealth v. Bathurst**, No. 821 MDA 2022 (Pa. Super. June 24, 2022) (order).

*Id.* at 17. Appellant challenges the court's reasoning based on Trooper Gordon not being in close proximity to Appellant "when analyzing the factor of police presence, which is necessary when evaluating police-citizen interaction." *Id.* at 24. Appellant claims Trooper Gordon was near him and his truck during Trooper Eichelberger's initial approach. *Id.* at 24-25. He states that the police cruiser was parked "a short distance" behind his truck. *Id.* at 25. According to Appellant, he "was surrounded by two uniformed State Troopers, who were shining their flashlights into his vehicle." *Id.* (footnote omitted). Appellant assails the suppression court's reliance on the troopers' testimony that there were "no physical impediments that would have prevented Appellant from driving away[.]" *Id.* at 26. Appellant further challenges the suppression court's emphasis on Appellant rolling down his window without being asked to do so. *Id.* Appellant relies on *Commonwealth v. Powell*, 228 A.3d 1 (Pa. Super. 2020), where this Court found an investigative detention under similar circumstances. *Id.* at 26-27.

Appellant argues:

> In the instant matter, the Suppression Court's conclusion ignores the fact that two uniformed state troopers pulled up behind Appellant's lawfully parked vehicle in their marked police units at 1:53 a.m., and proceeded to approach Appellant's vehicle on both sides, all while shining their flashlights in Appellant's vehicle. Under the totality of the circumstances, a reasonable citizen who was approached by multiple state troopers, with their full display of authority, would have felt compelled to believe that they had to roll down their window so that the trooper could engage with them, even without any direct commands to do so.

- 4 -

*Id.* at 27. Appellant claims the troopers effectuated an investigative detention unsupported by reasonable suspicion. *Id.* at 28. We disagree.

Our standard of review is well-settled:

When we review the ruling of a suppression court, we must determine whether the factual findings are supported by the record. When it is a defendant who appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Brame*, 239 A.3d 1119, 1126 (Pa. Super. 2020) (citation and brackets omitted). Our scope of review is limited to the record developed at the suppression hearing, considering the evidence presented by the Commonwealth as the prevailing party and any uncontradicted evidence presented by the appellant. *Commonwealth v. Fulton*, 179 A.3d 475, 487 (Pa. 2018).

There are three categories of encounters between citizens and the police:

(1) A mere encounter, (2) an investigative detention, and (3) custodial detentions. The first of these, a "mere encounter" (or request for information), need not be supported by any level of suspicion, but carries no compulsion to stop or respond. Second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Baldwin*, 147 A.3d 1200, 1202 (Pa. Super. 2016) (citation omitted). Mere encounters need not be supported by any level of suspicion of illegality, but an investigative detention must be supported by reasonable suspicion of criminal activity. *Commonwealth v. Adams*, 205 A.3d 1195, 1200 (Pa. 2019).

The line between mere encounters and investigative detentions is demarcated by an objective test known as the "free to leave" test. *Id.*; *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' … the encounter is consensual and no reasonable suspicion is required." (citation omitted)); *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The "free to leave" test "requires the court to determine 'whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Adams*, 205 A.3d at 1200 (quoting *Bostick*, 501 U.S. at 437).

We have explained:

> To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine

whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Commonwealth v. Reppert*, 814 A.2d 1196, 1201-02 (Pa. Super. 2002) (citations omitted).

In *Powell*, we concluded that officers had effectuated an investigative detention. *Powell*, 228 A.3d at 2. While on routine patrol at 11:37 p.m., Edinboro Police Officer William Winkler and a sheriff's deputy observed Ronald Powell's truck parked perpendicular to parking lines in a small public parking lot. *Id.* at 2. The truck's engine was running, and no other cars were in the lot. *Id.* Officer Winkler pulled his marked vehicle directly behind the passenger side of the truck but did not activate his lights. *Id.* Officer Winkler and the deputy exited their vehicle and approached Powell's driver and passenger side windows, respectively. *Id.* Although the windows were closed, Officer Winkler could see Powell eating food from Taco Bell. *Id.* Importantly, Officer Winkler ordered Powell to roll down his window. After Powell complied, Officer Winkler smelled a strong odor of alcohol and saw that Powell's eyes were glassy. *Id.* at 3. Officer Winkler then administered field sobriety tests. *Id.* When Powell failed the tests, Officer Winkler arrested him for DUI. *Id.* This Court affirmed the suppression court's determination that

under such circumstances, a reasonable person would not have believed he was free to leave. We explained:

> … Officer Winkler did not physically restrain Powell's movement. However, there were other factors in this case that convince us that a reasonable person in Powell's position would not have felt free to leave. Namely, while Powell sat alone in his vehicle, parked legally and eating food from a nearby restaurant, **Officer Winkler parked his vehicle "right behind" Powell's car. He and the sheriff's deputy both approached Powell's vehicle and positioned themselves on either side of it.** Although Officer Winkler could see that Powell was innocuously eating food, he knocked on Powell's window. **When Powell looked at him, Officer Winkler ordered Powell to lower his window. In light of the totality of these circumstances, Powell was subjected to an investigative detention at the point of that command.**

*Id.* at 7-8 (emphasis added).

By contrast, the evidence presented at Appellant's suppression hearing, viewed in a light most favorable to the Commonwealth, supports the suppression court's denial of suppression. At 1:53 a.m. on October 10, 2020, Trooper Eichelberger and Trooper Gordon observed taillights in a pull-off. N.T. (Suppression Hearing), 1/3/22, at 1-2, 6. Trooper Eichelberger testified:

> I specifically[] remember my partner, Trooper Gordon, noticing the taillights because I remember him saying, well, that's weird, there's taillights but there's no headlights. At least we don't remember seeing headlights as we passed.

*Id.* at 11.[3]

---

[3] Trooper Eichelberger testified Appellant's headlights were not on when the troopers "were up at" Appellant's vehicle. *Id.* at 11.

According to Trooper Eichelberger,

we c[a]me in through the second entrance and approach[ed] the vehicle from the rear. I specifically remember – I didn't turn on my [red and blue police] lights at all, just like I normally do. Every time I see a car parked there, especially at that time of night, I always want to check on the operator and make sure he's okay. So I always like to stop and talk to the operator, if they're okay, I'm on my way.

So I pull in, see the vehicle … I park my patrol vehicle, I would say at least 15 yards away, and I walk from the patrol vehicle on foot up to the driver's side of the vehicle.

*Id.* Notably, Trooper Eichelberger did not activate his red and blue police lights, and parked "at least 15 yards away" from Appellant's truck. ***See id.*** (explaining Appellant could have driven forward without impediment).

Trooper Eichelberger continued:

[A]s I approach[ed] from the driver's side, [Appellant] rolled down his window.[4] As he rolled down his window, I immediately detected an odor of alcohol emanating from the vehicle. While speaking with him, he initially denied drinking alcohol but then he later admitted that he got in an argument with his girlfriend, that he was just waiting to go to work. So he was sitting [there] waiting to go to work, and that he worked in the Bellefonte area doing construction.

*Id.* at 8 (footnote added). According to the trooper, Appellant "made it seem like he just got done at the Linger[-]In" bar. *Id.* at 27. Trooper Eichelberger observed that Appellant had "[s]luggish, glassy, bloodshot eyes," and saw an open case of beer on the backseat of the truck. *Id.* at 8. During this initial

---

[4] Trooper Eichelberger later testified he asked Appellant, "Are you okay, sir?" *Id.* at 23.

encounter, which Trooper Eichelberger described as a welfare check, he did not tell Appellant he was under arrest or could not leave. *Id.* at 8-9. Likewise, he did not exercise any force or restrain Appellant. *Id.* at 9.

Trooper Gordon also testified that the troopers drove into the pull-off area after seeing taillights. *Id.* at 30. Trooper Gordon stated that after the troopers parked their cruiser, "Nothing was blocking the front of [Appellant's] vehicle. He also, facing southbound, could have went out the southern exit of that pull-off." *Id.* at 31. Trooper Gordon confirmed that Trooper Eichelberger first approached Appellant's truck. *Id.* Trooper Gordon could not hear the conversation. *Id.* at 40, 41.

The totality of the circumstances in this case are distinguishable from *Powell*. As the suppression court explained:

> The court did review the case of *Commonwealth v*[*.*] *Powell* …. The court does make a couple of distinctions from this case.
>
> One, … the court [in *Powell*] relied on the fact that the officer ordered the defendant to lower his driver's side window. In this case, that was not the testimony that was provided[;] Trooper Eichelberger testified that [Appellant] voluntarily lowered his window.
>
> There was also, from the *Powell* decision, … officers [that] both approached the driver's side and the passenger's side. The court [in the instant case], based on the testimony that it heard today, that actually Trooper Eichelberger made the first contact initially to check … to see if [Appellant] was okay, based on it was 1:53 a.m., obviously this is a rural area, they did not see headlights, and Trooper Eichelberger testified that he has check[ed] on the welfare of motorists in that position late at night on other occasions. So the court will chock that up as a welfare check by the trooper.

> Based on that, the initial interaction was just a mere encounter and [Appellant] would have been free to leave, the reasonable person would have thought they would have been free to leave, and it did not escalate into an investigative detention until the trooper smelled alcoholic beverage upon talking to [Appellant].

N.T., 1/3/22, at 51-52 (some capitalization omitted).

The record supports the suppression court's rationale. *See id.*; *see also Commonwealth v. Collins*, 950 A.2d 1041, 1047-48 (Pa. Super. 2008) (officer was permitted to check on the welfare of occupants of a legally parked car at night even with no outward signs of distress, where he did not observe anything that led him to believe that something illegal was going on).

Our review further discloses that Trooper Eichelberger's subsequent investigative detention of Appellant was supported by reasonable suspicion. Appellant initially denied drinking, but then admitted consuming a couple of drinks at the Linger-In bar before driving to the pull-off; there were no empty beer cans or other evidence that Appellant had consumed alcohol while parked at the pull-off; and Appellant showed multiple signs of alcohol impairment. Given the totality of circumstances, we discern no error by the suppression court.

In his second issue, Appellant challenges the sufficiency of the evidence. Appellant's Brief at 29. Appellant specifically claims there insufficient evidence that he was operating or in physical control of his truck. *Id.* Appellant asserts there is no

- 11 -

[legal] authority that would suggest that a citizen could be found to be in actual, physical control[] of a motor vehicle simply by being found in the driver's seat with the motor running. Rather, there must be additional evidence to suggest that the defendant had been intoxicated when they started their vehicle and intended to drive from that area.

*Id.* at 32. Appellant points out that his headlights were not illuminated, and he was not wearing his seatbelt. *Id.* He claims, "the Commonwealth could not present any evidence as to when Appellant had driven or if he was intoxicated when he had driven." *Id.* at 32-33.

We recognize:

Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is *de novo* and our scope of review is plenary. We review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the [factfinder] to find every element of a crime beyond a reasonable doubt.

*Commonwealth v. Tejada*, 107 A.3d 788, 792 (Pa. Super. 2015) (citations and quotation marks omitted).

In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [factfinder,] while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part] or none of the evidence.

- 12 -

*Commonwealth v. Cahill*, 95 A.3d 298, 300 (Pa. Super. 2014).

Section 3802 of the Motor Vehicle Code provides:

**(a) *General impairment.***

**(1)** An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

**(2)** An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% but less than 0.10% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

**(b) *High rate of alcohol.* —** An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(a)(1)-(2), (b).

Appellant challenges the sufficiency of the evidence with respect to his operation and physical control of his truck. Appellant's Brief at 33. We have explained:

"The term 'operate' requires evidence of actual physical control of either the machinery of the motor vehicle or the management of the vehicle's movement, but not evidence that the vehicle was in motion." *Commonwealth v. Toland*, 995 A.2d 1242, 1246 (Pa. Super. 2010) (quoting *Commonwealth v. Brotherson*, 888 A.2d 901, 904 (Pa. Super. 2005)). "The

Commonwealth can establish through wholly circumstantial evidence that a defendant was driving, operating or in actual physical control of a motor vehicle." ***Id.*** (quoting ***Brotherson***, 888 A.2d at 905). Courts review "a combination of the following factors" to determine "whether a person had 'actual physical control' of an automobile: the motor running, the location of the vehicle, and additional evidence showing that the defendant had driven the vehicle." ***Id.*** (quoting ***Brotherson***, 888 A.2d at 904). "A determination of actual physical control of a vehicle is based upon the totality of the circumstances." ***Id.*** (quoting ***Brotherson***, 888 A.2d at 905).

***Commonwealth v. Fallon***, 275 A.3d 1099, 1105 (Pa. Super. 2022).

Here, the Commonwealth presented evidence that Appellant parked his truck in the pull-off with its rear lights on. N.T. (Trial), 3/14/22, at 5-6. Trooper Eichelberger testified, "after my partner stated that he observed taillights, we pulled in from the northern entrance, approaching the vehicle from the rear." ***Id.*** at 9. As Trooper Eichelberger walked toward the truck, Appellant rolled down his window. ***Id.*** at 10. The trooper saw keys in the ignition and the engine was running. ***Id.*** at 12. Trooper Eichelberger testified:

[Appellant's] eyes were bloodshot, he appeared sluggish, had slurred speech. He indicated that he was sitting there at the pull off waiting to go to work, which I felt was odd because it was a Sunday morning, but that's what he stated. He was just waiting to go to work. He got in this argument with his girlfriend, and that he had just came from the Linger-In Tavern where he had two beers.

…

So initially when I asked him, he stated that he did not drink. While standing there I also observed an open case of [beer] in the back seat … behind where [Appellant] was seated. At which point he's like, I did have two beers at Linger-In, I came from there. I'm now sitting here waiting to go to work.

- 14 -

*Id.* at 11-12. Appellant told Trooper Eichelberger the case of beer was "old." *Id.* at 13.

On cross-examination, Trooper Eichelberger repeated that Appellant admitted to drinking two beers at the Linger-In. *Id.* at 26. Trooper Eichelberger explained:

> [Appellant] said [he] just came from the Linger-In. He never gave an exact time. He never said – I don't know if his interpretation is just coming from the Linger-In is an hour ago or if it's 15 minutes ago. He never gave that interpretation. That's just the words he provided to me.

*Id.* at 26. After Appellant failed field sobriety tests, his BAC was tested and "was .114 [percent], plus or minus .014 percent." *Id.* at 20.

In deeming the evidence sufficient to demonstrate Appellant operated or was in physical control of the vehicle, the trial court opined:

> Here, testimony was presented at [Appellant's] Non-Jury Trial which suggested that [Appellant's] vehicle's engine was running and the stereo was active when responding troopers discovered his vehicle on a public highway pull-off and approached. The evidence reflected [Appellant's] own admission that he had drank two beers shortly before driving to the location where he was found by the responding troopers. … This [c]ourt … was satisfied by the Commonwealth's showing that [Appellant] exercised actual physical control of his vehicle after imbibing a sufficient amount of alcohol to render him unable to safely exercise such control. This evidence, viewed in a light most favorable to the Commonwealth, established that Appellant violated 75 Pa.C.S.A. § 3802(a)(1)-(2) and (b)…. Because [Appellant's BAC] concentration was found to be .114%, plus or minus .014%, and because [Appellant] was in actual physical control of his vehicle, the evidence supports this [c]ourt's verdict.

Trial Court Opinion, 6/28/22, at 4-5; *see also id.* at 6 (evidence sufficient to sustain Appellant's conviction under Section 3802(a)(2)); 7 (evidence sufficient to sustain Appellant's conviction under Section 3802(b)). As the record supports the trial court's findings, we discern no error.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2023