J-A06013-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| MARISSA GARNET DILLEY | : | |
| Appellant | : | No. 792 WDA 2025 |

Appeal from the Judgment of Sentence Entered May 30, 2025
In the Court of Common Pleas of Elk County Criminal Division at No(s):
CP-24-CR-0000203-2024

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY OLSON, J.:                    **FILED: June 8, 2026**

Appellant, Marissa Garnet Dilley, appeals from the May 30, 2025 judgment of sentence entered in the Court of Common Pleas of Elk County after the trial court convicted Appellant, in a non-jury trial, of driving under influence of alcohol or controlled substance – general impairment ("DUI") (first offense) and several summary offenses for motor vehicle violations.[1]  For her DUI conviction, the trial court sentenced Appellant to three to six months' incarceration in a county prison but immediately paroled Appellant on the

_____

[1] 75 Pa.C.S.A. § 3802(a)(1).  Appellant was convicted of the following summary offenses: two counts of restriction on alcoholic beverages (Counts 2 and 3), registration and certificate of title required (Count 4), operation following suspension of registration (Count 5), driving while operating privilege is suspended or revoked (Count 6), carrying and exhibiting driver's license on demand (Count 7), driving on roadways laned for traffic (Count 8), and driving on right side of roadway (Count 9).  75 Pa.C.S.A. §§ 3809(a) (two counts), 1301(a), 1371(a), 1543(a), 1511(a), 3309(1), and 3301(a), respectively.

condition she strictly comply with an approved parole plan. Appellant was also ordered to pay an aggregate fine of $1,500.00.[2] We affirm.

The record demonstrates that, on June 1, 2024, at approximately 3:50 a.m., Pennsylvania State Police Troopers Matthew Batzel ("Trooper Batzel") and Brandt Beck ("Trooper Beck") were dispatched to investigate a report of a single-vehicle accident. Upon arriving at the scene, Trooper Batzel "observed a middle-aged female walking away from the crash scene in a hurried manner." Criminal Complaint, 6/7/24, at Affidavit of Probable Cause. According to Trooper Batzel, "[t]he female was visibly intoxicated, stumbling, staggering, and unsure of her footing[, which resulted in the female falling] into a ditch." *Id.* George Amacher ("Mr. Amacher") informed Trooper Batzel that, upon hearing the sounds of a "crash" outside his residence and approaching the vehicle to investigate, he "noticed just one female sitting in the driver's seat [of the vehicle, and that he had to help] the female operator exit the vehicle." *Id.* Appellant refused to provide Trooper Batzel with identification, upon request. After running the vehicle's registration through police databases, Trooper Batzel learned that the vehicle was registered to Appellant, that the vehicle registration was revoked, as well as expired, and that Appellant's driving privileges had been previously suspended. While

---

[2] For her DUI conviction under Section 3802(a)(1), Appellant was ordered to pay a mandatory fine of $1,000.00. For her convictions of Counts 2 – 3, and 7 – 9, the trial court ordered Appellant to pay a $25.00 fine as punishment for each conviction. On Count 4, the trial court ordered Appellant to pay a $75.00 fine, on Count 5, a $100.00 fine, and on Count 6, a $200.00 fine.

interviewing Appellant, Trooper Batzel observed that Appellant's eyes were bloodshot and glossy, her pupils were dilated, her speech was thick and slurred, and she was verbally combative, repeatedly asking Trooper Batzel to "prove that [she] was driving" the vehicle. *Id.* Trooper Batzel smelled "a strong odor of an alcoholic beverage emanating from [Appellant's] person and breath." *Id.* Appellant refused to submit to a series of standardized field sobriety tests.

In conducting an investigation of the accident scene, Trooper Batzel noted the following observations:

> Located on scene was a six-pack cardboard carrier of Smirnoff Ice and a bottle of Fireball [Whisky,[3]] which was half full on the passenger side floorboard of the vehicle. There was a 12 [ounce] Smirnoff Ice glass bottle in the front yard of [Mr. Amacher's] residence.

> After close observation of the vehicle at final rest, both driver-side doors were only able to open approximately 6 inches before striking the road. Due to this [restriction], the only way for [Appellant] to exit the vehicle would be through the passenger side door at a forty-five-degree angle. This evidence shows that anyone in the vehicle would have needed assistance to exit [the vehicle].

*Id.*

---

[3] We note that Fireball Whisky "traces its roots back to the cold land of Canada, where 'whisky' is spelled without the letter ["E."] ***See*** https://www.fireballwhisky.com/faqs.html#accordion-8d2d099d19-item-d61775ffed (last visited May 26, 2026). The distiller uses natural cinnamon in the production of Fireball Whisky. *Id.*

On June 7, 2024, Appellant was charged with the aforementioned offenses stemming from the automobile accident. On March 14, 2025, the trial court convicted Appellant, in a non-jury trial, of the aforementioned offenses. Appellant was sentenced, as detailed *supra*, on May 30, 2025. This appeal followed.[4]

Appellant raises the following issues for our review:

I. Whether the evidence was insufficient to sustain Appellant's conviction as the evidence failed to prove beyond a reasonable doubt that Appellant was driving the vehicle at the time of the accident when no one placed [] Appellant in the driver's seat while the [vehicle] was moving, and Appellant denied that she had been driving[?]

II. Whether the evidence was insufficient to sustain Appellant's conviction as the evidence failed to prove beyond a reasonable doubt that Appellant was incapable of safe driving due to the consumption of alcohol before the accident (at the time of driving) when there was a half[-]empty can of Smirnoff [Ice] found in the yard next to the crash scene and other evidence [suggesting] consumption of alcohol after the accident[?]

Appellant's Brief at 5.

Appellant's issues collectively challenge her conviction of Section 3802(a)(1) on the grounds that the Commonwealth failed to prove, beyond a reasonable doubt, that Appellant was operating the vehicle and was incapable

---

[4] Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

- 4 -

of operating the vehicle at the time of the accident due to the consumption of alcohol prior to the accident.

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying [this] test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [fact-finder,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Reed*, 216 A.3d 1114, 1119 (Pa. Super. 2019).

Section 3802(a)(1) of the Motor Vehicle Code states that "[a]n individual may not drive, operate[,] or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating[,] or being in actual physical control of the movement of the vehicle." 75 Pa.C.S.A. § 3802(a)(1).

As our Supreme Court explained in *Commonwealth v. Segida*, 985 A.2d 871 (Pa. 2009), Section "3802(a)(1) is an 'at the time of driving' offense, requiring that the Commonwealth prove the following elements: the accused was driving, operating, or in actual physical control of the movement of a

- 5 -

vehicle during the time when he or she was rendered incapable of safely doing so due to the consumption of alcohol." *Segida*, 985 A.2d at 879. Section 3802(a)(1) is "a general provision and provides no specific restraint upon the Commonwealth in the manner in which it may prove that an accused operated a vehicle under the influence of alcohol to a degree which rendered him [or her] incapable of safe driving." *Id.* "The types of evidence that the Commonwealth may proffer in a [Section] 3802(a)(1) prosecution include but are not limited to, the following: the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating [police] officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol, and slurred speech." *Id.*

Recently, our Supreme Court, in *Bold v. Dep't of Transp.*, 320 A.3d 1185 (Pa. 2024), examined the intended definition of the phrase "to drive, operate, or be in actual physical control of the movement of a vehicle." *Bold*, 320 A.3d at 1187 (stating, "[w]hat concerns us today is the meaning of 'to have been driving, operating[,] or in actual physical control of the movement of a vehicle'"). Although the *Bold* Court recognized the presumption that disfavors interpreting statutory language as mere surplusage, in the instance of interpreting the phrase "driving, operating, or being in actual physical control of the movement of a vehicle," the terms "driving," "operating," and "actual physical control of the movement," the *Bold* Court determined, were synonymous with one another. *Id.* at 1193-1196 (explaining that, the term

"operating" for purpose of Section 3802 "plainly encompasses 'driving' and arguably subsumes 'actual physical control of the movement of a vehicle' as well. Once a [vehicle] moves under a person's control, it clearly has been operated." Similarly, the term "driving" for purpose of Section 3802, "encompasses actual physical control of the movement of the vehicle."). The **Bold** Court stated that the phrase "driving, operating, or be in actual physical control of the movement of the vehicle" required the Commonwealth to show that the motorist did something that caused the actual movement of the vehicle "near in time to the police encounter." **Id.** at 1193. Stated simply, the Commonwealth must establish that the motorist actually "drove" the vehicle (a continuation of activity that transported the motorist from one point to another) near in time to the police encounter. **Id.** at 1197. In reaching its conclusion, the **Bold** Court explained that "a line must be drawn" that distinguishes between a motorist driving a vehicle and merely being present in the vehicle. **Id.** ta 1197-1198.

To establish that the motorist "drove," "operated," or was in "actual physical control of the movement" of the vehicle, courts "must consider the totality of the circumstances, including the location of the vehicle, whether the engine was running[,] and **whether there was other evidence indicating that the motorist had driven the vehicle at some point prior to the arrival of the police**." **Id.** at 1196-1197 (emphasis in original), *quoting* **Banner v. Dep't of Transp.**, 737 A.2d 1203, 1207 (Pa. 1999); **see also Commonwealth v. Wolen**, 685 A.2d 1384, 1385 (Pa. 1996). "The

Commonwealth can establish through wholly circumstantial evidence that a defendant was driving, operating[,] or in actual physical control of a motor vehicle." ***Commonwealth v. Bathurst***, 288 A.3d 492, 501 (Pa. Super. 2023) (citations omitted).

Appellant asserts that "the evidence was insufficient to establish that [she] was in actual physical control of the [vehicle] at the time of the crash." Appellant's Brief at 20. Appellant contends that "no one witnessed [her] behind the wheel of the [vehicle] at the time it was in motion" and that Trooper Batzel "concluded Appellant was driving the vehicle at the time of the accident because [she] was the only person present [and] connected with the vehicle when [Trooper Batzel] arrived at least 45 minutes after receiving the call [regarding the accident]." ***Id.*** at 21. Appellant further contends that she "specifically and repeatedly told [Trooper Batzel and Mr. Amacher] that her cousin had been driving [the vehicle at the time of the accident] and had taken off toward the woods [after the accident.]" ***Id.*** Appellant concedes that while she "referred to a cousin as the driver" she "refused to provide [the cousin's] name" to the state troopers. ***Id.*** at 16. Nonetheless, Appellant argues the "rationale for not following through on Appellant's claim that the actual driver, her cousin, ran to the woods is faulty and unpersuasive." ***Id.*** at 22. Appellant also asserts that the placement of the alcohol on the floor of the passenger side of the vehicle "suggests Appellant was a passenger and not the driver" of the vehicle. ***Id.*** at 23. Appellant argues that "the Commonwealth's entire

proof that Appellant was driving [the vehicle] is [the] mere disbelief of her denial that she was driving." *Id.* at 25.

Appellant further contends that, even if the evidence sufficiently proves that she was the driver of the vehicle, the evidence was insufficient to prove she consumed alcohol prior to operating the vehicle. *Id.* at 26. Appellant argues that "[t]he Commonwealth utterly failed to relate [her] conditions observed when [the police troopers] arrived on scene back to when the accident occurred." *Id.* at 28. Appellant asserts that, "[s]imply put, there is absolutely no evidence of [her] alcohol consumption **before** the crash[, but t]here is plenty of evidence of consumption after the crash[.]" *Id.* at 30 (emphasis in original). Appellant's argument rests on the theory that she returned to the vehicle several times after initially exiting the vehicle with the assistance of Mr. Amacher and that she had access to, and consumed, alcohol after the accident. *Id.* at 29-30. Appellant contends that the Commonwealth offered only the testimony of Trooper Beck, who testified that there would be "no conceivable way that somebody could reach the viewed level of intoxication" in the amount of time between the accident and when the state troopers observed Appellant's actions. *Id.* at 34. Appellant further argues that her impairment, as observed by the state troopers, was "hardly conclusive evidence that [she] was impaired to a degree which would have rendered her incapable of safe driving at the time of the crash." *Id.* at 30.

In finding Appellant guilting of violating Section 3802(a)(1), the trial court stated,

the [trial] court's verdict is based upon, again the evidence presented. The [trial] court finds the Commonwealth's witnesses to be credible. In particular, the [trial] court found the testimony of [Mr. Amacher and Elizabeth Amacher ("Mrs. Amacher")], in particular [Mr. Amacher], to be credible as it relates to the verdict.

N.T., 3/14/25 (Volume II), at 34 (extraneous capitalization omitted).[5] The

trial court further explained,

[Mr. Amacher], a nearby neighbor to the crash scene, almost immediately[,] if not instantaneously following the crash, namely in less than one minute, responded to the crash scene in close proximity to his residence where he observed one female occupant in the driver's seat of the vehicle that had crashed and no other individuals in the crashed vehicle or in the area. Specifically and notably, [Appellant] was unable to self-extract herself from the crashed vehicle due to the vehicle having been lodged against an embankment, consequently, [Mr.] Amacher assisted [Appellant] in removing herself from the vehicle. [The trial] court emphasizes that [Mr.] Amacher almost immediately[,] if not instantaneously after the crash occurred[,] responded to the scene and identified one occupant in the crashed vehicle seated in the driver's seat which based upon the totality of all the evidence presented was in fact [Appellant. The trial] court found [Mr.] Amacher and [Mrs. Amacher] to be credible as to their testimony regarding their immediate observation of the vehicle crash which substantially constrains the time line to support [Appellant's] theory that she was not the driver of the vehicle but she ended up in the driver's seat following the crash and that the actual driver was able to extract [himself or herself] from the crashed vehicle without assistance when [Appellant] herself could not extract herself from the crash[ed] vehicle all of which would have occurred in less than

---

[5] Appellant's trial was conducted in the course of a single day with a morning session and, after a brief recess, an afternoon session. A different court reporter was responsible for preparing the notes of testimony at each session. As a result, the notes of testimony are memorialized in "Volume I" which covered the start of trial until the recess, and "Volume II" which began after the recess and continued through the close of trial. For ease of reference, we note the volume number when referring to the notes of testimony.

a minute following the crash based upon the testimony of [Mr.] Amacher and [Mrs.] Amacher.

. . .

[Trooper Beck], a Pennsylvania state trooper stationed at the] Ridgway Barracks, [] testified he observed within the crashed vehicle, namely on the passenger side floorboard, an empty Smirnoff Ice bottle, a half-consumed bottle of Fireball [Whisky] and a six-pack cardboard holder for Smirnoff [Ice] alcoholic beverage container[s]. Again, the crashed vehicle is the same vehicle [in which Mr.] Amacher observed [Appellant seated] alone in the driver's side seat following the crash. [The trial] court maintains that fair inferences may be drawn from the evidence presented including [Appellant's] behavior and demeanor at the scene of the crash that [Appellant] did[,] in fact[,] consume alcoholic beverages prior to the vehicle crash occurring.

Trial Court Opinion, 8/12/25, at 2-3 (record citations and extraneous capitalization omitted).

At trial, Trooper Beck testified that, after arriving at the scene of the accident, he observed a single female, who was identified later as Appellant, "hurriedly walking away from the scene of the crash heading towards [Mr. Amacher's] house." N.T., 3/14/25 (Volume I), at 9-10. Trooper Beck described Appellant as "stumbling" and "staggering" as she walked towards Mr. Amacher's house, and she "definitely displayed signs of poor coordination as she was trying to distance herself from the crashed [vehicle]." *Id.* at 11. Trooper Beck stated that he observed Appellant stumble "into a ditch and [fall] down." *Id.* Trooper Beck testified that, when he was in close proximity to Appellant," he smelled "a strong odor of an alcoholic beverage emanating from her person" and, in particular, he recalled smelling "cinnamon." *Id.* at 12, 22-23. Appellant's eyes were observed to be bloodshot and glossy and her

pupil size was enlarged. *Id.* Trooper Beck stated that Appellant's speech was "thick and slurred and she was talking in a repetitive manner, saying the same thing over and over again[.]" *Id.* at 12-13. Trooper Beck described Appellant's demeanor as "being combative," stating specifically that she was belligerent, disrespectful, and uncooperative with severe mood swings consistent with signs of intoxication. *Id.* at 23, 25-26. Trooper Beck also stated that, at one point, he observed Appellant "definitely utilizing the front of the patrol unit to stay balanced, leaning on it for support." *Id.* Trooper Beck testified that, in his opinion and based on his experience, he believed Appellant was intoxicated and incapable of safe driving based on "her eyes, her speech, the odor emanating from her, her balance as she moved around[ after exiting the vehicle,] and her mood swings." *Id.* at 24. Trooper Beck further stated that, in his opinion, Appellant's intoxication occurred before the accident because there was "no conceivable way that somebody could reach [Appellant's] viewed level of intoxication in the amount of time" between the accident and when the police troopers arrived at the scene of the accident. *Id.* at 33.

On cross-examination, Trooper Beck explained that Appellant indicated to him "dozens of times" that she was not the driver of the vehicle. *Id.* at 42. Trooper Beck stated that Appellant indicated that a male cousin was driving the vehicle, but Appellant would not provide him the cousin's name. *Id.* at 43.

Regarding the vehicle, Trooper Beck stated that the vehicle was discovered crashed into an embankment and ditch and was "leaning at an approximate 45-degree angle towards the driver's side" of the vehicle. *Id.* Trooper Beck testified that "[d]ue to the angle of the vehicle, the driver's side front and rear doors were pinned against the embankment, so they could not be opened more than [six or eight] inches." *Id.* at 13-14. Given the inability to open the driver's side front door a sufficient distance to allow the driver to exit the vehicle, coupled with the fact that the driver's side front door window was found to be in an "up" or closed position after the crash, Trooper Beck concluded that the driver of the vehicle exited the vehicle using the passenger side of the vehicle. *Id.* at 14. Trooper Beck testified that he observed "an empty Smirnoff Ice bottle, [a] half[-]consumed bottle of Fireball [Whisky,] and a six-pack container holder for the Smirnoff Ice alcoholic beverage" on the passenger side floorboard of the vehicle. *Id.* at 19. Trooper Beck stated that these items, discovered on the passenger side floorboard, were within reach of a person located in the vehicle's driver's seat. *Id.*; *see also* Commonwealth Exhibits 3 and 4. Trooper Beck also found "a Smirnoff Ice bottle[, matching the bottle observed] inside the vehicle that was half to three-quarters full by the retaining wall of [Mr. Amacher's] residence." N.T., 3/14/25 (Volume I), at 21; *see also* Commonwealth Exhibits 5 and 6.

Mr. Amacher testified that, on June 1, 2024, at approximately 3:45 a.m., he was awoken by Mrs. Amacher, who informed him that a vehicle accident had just occurred outside the residence. N.T., 3/14/25 (Volume I),

at 49. Mr. Amacher stated that it took him "a matter of seconds" to put on his shoes and proceed to the scene of the accident where he observed a single female in the vehicle. *Id.* at 50. He did not observe any other person in the vicinity of the accident, other than the female who was still inside the vehicle. *Id.* Mr. Amacher stated that the person he observed in the vehicle was positioned in the driver's seat, but, at trial, he was unable to state, definitively, whether, or not, Appellant was the female he observed in the vehicle on the night of the incident. *Id.* at 51. Mr. Amacher assisted the female in exiting the vehicle *via* the passenger side of the vehicle by supporting her under her arm and "help[ing] pull her out of the [vehicle]" due to the angle at which the vehicle was at rest. *Id.* at 52-53. Mr. Amacher stated that the female informed him that her cousin had been driving the vehicle. *Id.* at 53. Mr. Amacher stated that, after helping the female from the vehicle, he smelled alcohol on the female's person. *Id.* at 53. Mr. Amacher described the female as having been "drinking" but "she wasn't like staggering around." *Id.* Mr. Amacher stated that he was able to smell alcohol when talking with the female and he observed "bottles" lying on the passenger side floorboard of the vehicle. *Id.* Mr. Amacher testified that, immediately after exiting the vehicle, the female asked him not to call the police because she had prior DUIs. *Id.* at 54. Mr. Amacher also explained that the female returned to the vehicle in search of her cellular telephone and that she was walking back towards him "about the time the police [arrived]." *Id.* at 58. Mr. Amacher stated that, as she was returning from the vehicle, the female fell in "a culvert."

Mrs. Amacher testified that, at approximately 3:45 a.m. on the date of the accident, she was awoken by the sound of the crash. *Id.* at 61. Mrs. Amacher stated that she immediately went to the bedroom window, opened it, observed a vehicle "in the ditch," and informed Mr. Amacher that there had been an accident. *Id.* at 62. Mrs. Amacher then returned to the bedroom window after informing Mr. Amacher of the accident. *Id.* at 64. Mrs. Amacher stated that she was only away from the bedroom window "maybe five seconds" and that during the time periods that she was observing the accident scene, she did not see anyone "climb out of the vehicle." *Id.* Mrs. Amacher estimated that it took Mr. Amacher 30 seconds to put on his shoes before leaving the house and to begin walking towards the accident scene. *Id.* at 65. She stated that, from her vantage point at the bedroom window, she heard a female speaking to Mr. Amacher. *Id.* Mrs. Amacher testified that the police responded to the scene of the accident approximately 45 minutes after it first occurred. *Id.* at 70.

Trooper Batzel testified, that upon his arrival, with Trooper Beck, to the scene of the accident, he observed Appellant walking "directly away from the [accident scene] in a hurried manner." *Id.* at 78-79. When he interacted with Appellant, Trooper Batzel stated that "[t]here was a strong odor of an alcoholic beverage emanating from her person as well as her breath." *Id.* at 80, 84. He described Appellant has having "bloodshot, glossy, dilated pupils" and "thick slurred speech," both of which indicated prior alcohol consumption. *Id.* Trooper Batzel confirmed that the driver's side front and rear doors of the

- 15 -

vehicle could not be opened due to the angle at which the vehicle came to rest after the accident. *Id.* at 81. Trooper Batzel testified that he also observed a Smirnoff Ice bottle, a cardboard carrier for Smirnoff Ice, and a "half empty" bottle of Fireball Whisky on the passenger side floorboard of the vehicle. *Id.* at 83. He also located a Smirnoff Ice bottle, which was the same type of bottle discovered in the vehicle, in Mr. Amacher's front yard. Trooper Batzel stated that when Appellant was asked to provide her name, she "just kept yelling or screaming," "Prove it. Prove it. Prove I was driving." *Id.* at 84. Appellant told Trooper Batzel that her cousin was driving the vehicle at the time of the accident but refused to provide his name. *Id.* at 85. Based upon his observations of Appellant at the scene of the accident, Trooper Batzel asked Appellant to submit to standardized field sobriety tests, which she refused. *Id.* Appellant was then placed under arrest for suspicion of driving while impaired and, later, refused to perform a chemical test of her breath at the police barracks. *Id.* at 86-87. Trooper Batzel stated that based upon his training and experience and the accident scene investigation, Appellant was the driver of the vehicle and, based on his observations of "thick[,] slurred speech, bloodshot glossy eyes, [and] open containers [discovered in] the vehicle as well as in the yard[,]" Appellant was driving the vehicle while impaired. N.T., 3/14/25 (Volume II), at 7.

On cross-examination, Trooper Batzel explained that the 911 emergency center received a report about the accident at 3:44 a.m., on June 1, 2024, and that he and Trooper Beck were dispatched to the scene at

3:50 a.m. *Id.* at 10. Trooper Batzel stated that Appellant informed him that, as a result of the accident, she hit the left side of her forehead against the vehicle's window, which indicated to Trooper Batzel, that Appellant was positioned in the driver's seat of the vehicle at the time of the accident. Trooper Batzel did agree, however, that, due to the configuration of the interior of the vehicle and the lack of a console area, it was possible for Appellant to slide from the passenger side of the vehicle into the driver's seat during the accident. *Id.* at 11-13. On re-direct examination, Trooper Batzel further explained that, while the interior configuration of the vehicle may have allowed Appellant to slide from the passenger side to the driver's side of the vehicle during the accident, Appellant, if she were, in fact, the passenger that evening, would have been prevented from sliding into the driver's seat and striking her head on the driver's side door window because the "cousin" would been in the driver's seat at the time of the accident and, therefore, would have prevented Appellant's movement into the driver seat. *Id.* at 14.

In viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, we concur with the trial court, and the record supports, that the Commonwealth presented sufficient evidence that Appellant was driving, operating, or in actual physical control of the movement of her vehicle at the time of the accident and, at such time, she was rendered incapable of safely doing so due to the consumption of alcohol. Mr. Amacher testified that, in close temporal proximity to the occurrence of the accident, he discovered Appellant in the driver's seat of the vehicle that had come to

rest, due to the accident, at a 45 degree angle along the roadway. The position of the vehicle did not allow an individual to exit the vehicle using the driver's side door. Instead, an individual had to exit the vehicle through the passenger side of the vehicle. No other individual, other than Appellant, was observed at, or fleeing from, the scene of the accident. As such, based upon the totality of the circumstances, the evidence was sufficient to establish, beyond a reasonable doubt, that Appellant was the driver of the vehicle. *See Commonwealth v. Wilson*, 660 A.2d 105, 107 (Pa. Super. 1995) (stating that, there was sufficient evidence to establish that Wilson was in actual physical control of the movement of the vehicle when he was discovered in the driver's seat of the vehicle, alone, and the vehicle was positioned at the bottom of an embankment, which indicated that the vehicle was not "parked" but, rather, "stopped" when Wilson drove off the road into the embankment); *see also Commonwealth v. Taylor*, 352 A.2d 137, 140 (Pa. Super. 1975) (stating that, there was sufficient evidence Taylor was in actual physical control of the movement of the vehicle when he was discovered in the driver's seat of the vehicle after the crash and that the vehicle veered "off the highway" due to a "violent collision" and not because of Taylor's own choosing).

After helping to extract Appellant from the vehicle *via* the passenger side of the vehicle, Mr. Amacher stated that he smelled alcohol on Appellant's person. This fact was later confirmed by Trooper Beck and Trooper Batzel. The state troopers observed, based upon their training and experience, that

Appellant exhibited several signs of intoxication, including dilated pupils, bloodshot, glossy eyes, stumbling and staggering, and the odor of alcohol, and in particular the odor of cinnamon, emanating from Appellant's person, shortly after the accident. The state troopers were of the opinion, based upon their training and experience and the accident investigation, that Appellant was sufficiently intoxicated at the time of the accident such that she was not capable of driving, operating, or being in physical control of the vehicle. Based upon the totality of the circumstances, this evidence was sufficient to support the trial court's conclusion, as fact-finder, that Appellant was rendered incapable of safely driving, operating, or being in actual physical control of the movement of the vehicle at the time of the accident in violation of Section 3801(a)(1).

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/08/2026